446 So.2d 293 (1984)
STATE of Louisiana
v.
James Harold CLARK.
No. 82-KA-2026.
Supreme Court of Louisiana.
January 16, 1984.
Rehearing Denied February 15, 1984.
*294 William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., James L. Davis, Dist. Atty., Herman L. Lawson, Abbott J. Reeves, Asst. Dist. Attys., for plaintiff-appellee.
J. Michael Small, Kathrine Williamson, Alexandria, Thomas K. Brocato, Gravel, Robertson & Brady, Alexandria, for defendant-appellant.
LEMMON, Justice.
Defendant was convicted of negligent homicide arising from an alcohol-related traffic fatality and sentenced to five years imprisonment at hard labor. The principal issues on appeal relate to (1) the failure of the trial court to grant a mistrial after a trooper testified to an inculpatory statement made by defendant at the accident scene, (2) the admission of the results of blood alcohol tests, (3) the trial court's instructions on the presumption of intoxication, *295 the relationship between violation of a statute and criminal negligence, and the meaning of the term "reasonable doubt", and (4) the excessiveness of the sentence.
Facts
The midday collision occurred at the "T" intersection of two rural highways. Defendant's car failed to stop for a stop sign and struck a motor home. The impact pushed the motor home into the opposing lane of traffic, where it collided with a pickup truck, resulting in the death of the truck driver.
The defense was that defendant was not driving his car at the time of the collision, but had switched places after impact with the other occupant, Mark Fruge. While defendant was found behind the wheel of his car after the collision, Fruge had been seen driving the car earlier.
On the evening before the accident, defendant and Fruge, along with several other young people, drank and socialized at a camp until the early morning hours. Fruge and defendant decided to go hunting and left in a borrowed white Chevrolet. With Fruge driving, they hunted along the road for a while. Not having much luck, they decided to buy a bottle of whiskey and return to the camp.
Fruge, who was unfamiliar with the area, asked defendant for directions to the camp. According to Fruge, defendant took over the driving and headed north on Highway 476. Before reaching the "T" intersection, they passed an automobile driven by Kenneth Plum.
Plum testified that the white Chevrolet almost ran him off the road. He stated that Fruge was hanging out of the passenger window, waving his arms wildly and screaming. Plum pursued the Chevrolet in an effort to get the license number, but when the white Chevrolet bumped into the rear end of another vehicle and forced it off the road, Plum stopped to check on the occupants. He then set out again in pursuit of the Chevrolet.
Plum arrived at the intersection almost immediately after the accident had occurred. He saw Fruge in the passenger seat of the Chevrolet and saw defendant with his face down over the steering wheel. Both young men appeared to be cut and injured. Plum was then called to aid in extricating the victim from her truck, but rescuers quickly discovered that she had no pulse and was not breathing. Plum then turned his attention back to the Chevrolet as he heard defendant yell, "Man, what a wild ride we have had". Several people approached the Chevrolet, but then halted when the two young men got out and began to unload the shotguns they had previously used to shoot at birds.
Fruge was boisterous and obviously intoxicated. He walked over to the dead woman in the pickup truck and began to holler at her to wake up, drunkenly telling her that she should not be sleeping. Fruge then yelled back at defendant, "Hey, Jim, you really screwed up this time".
Within a few minutes of the wreck, a state trooper arrived. After a brief preliminary inquiry, he approached defendant and Fruge near the white Chevrolet. In response to the trooper's inquiry, defendant stated that he "guessed" he was driving, but disclaimed any memory of the preceding events.
Both defendant and Fruge were taken to a nearby hospital for emergency treatment. The officer advised defendant of his constitutional rights and of the consequences of a refusal to submit to a chemical test. However, the officer did not have a "rights form" available for defendant to sign. Defendant did sign a consent to have blood extracted for testing, but he was otherwise uncooperative, refusing to identify himself or his parents and refusing medical attention. The emergency room physician described defendant as hostile, combative, obscene, and very intoxicated.
Defendant was later taken to police headquarters for a PEI test. After being advised of his right to refuse and of the consequences of refusal, defendant refused to sign the forms, but agreed to take the test. The PEI indicated a blood alcohol content of 0.29 percent.
*296 The blood extracted at the hospital showed a blood alcohol content of 0.34 percent. In testifying concerning the difference in the results, a crime laboratory technician explained that the natural dissipation of the alcohol in the blood during the lapse of more than an hour between the drawing of the blood and the subsequent PEI test would account for the difference in the level of blood alcohol.
At trial two other witnesses, in addition to Fruge and Plum, testified that defendant was the driver of the car and that Fruge was the passenger at the time of the collision. (One witness was the motorist who was run off the road just before the accident; the other witness was stopped at the intersection when the accident occurred.) The defense called only one witness, who testified that Fruge was driving when he saw the car at about 11:30 a.m. Other evidence established that the accident occurred shortly after noon.
Inculpatory Statement
When the state was presenting its case-in-chief, the prosecutor asked the investigating trooper what he did after his preliminary investigation at the scene of the accident. The trooper responded that he approached defendant and Fruge and asked "who was driving", to which defendant responded that he "guessed" he was.
After the officer's expansive response to the prosecutor's question, defendant moved for a mistrial. Conceding that he had received a "768 notice" informing him that the state would prove "inculpatory" statements made by defendant at the wreck scene, defense counsel argued he was never apprised that the state would produce evidence of this equivocal admission that the defendant was driving.
We need not decide in this case whether this is the sort of statement to an officer in response to "interrogation" which must be disclosed in substance pursuant to La.C.Cr.P. Art. 716. Failure to make full disclosure does not always require a mistrial. The court has the discretion to consider the facts presented and to decide which course the interest of justice requires. For example, granting a recess to enable a defendant to prepare to meet the newly-revealed evidence may be more appropriate.
Defense counsel did not request additional time to prepare to counter the equivocal admission. Rather, skillfully arguing at the close of the evidence that Fruge designed his accusatory comment ("Hey, Jim, you really....") to make defendant think that he was driving, counsel contended that defendant did not remember anything about the wreck and that the equivocal statement merely acknowledged what Fruge had told him just moments before the inquiry.
We conclude that the defense was not so prejudiced by the failure of the prosecution to disclose fully the contents of defendant's statement to the state trooper that a mistrial was required. See State v. Ray, 423 So.2d 1116 (La.1982). Compare State v. Mitchell, 412 So.2d 1042 (La.1982), and State v. Meshell, 392 So.2d 433 (La. 1980), in which failure to make timely disclosure was found to be reversibly prejudicial.
Admissibility of Evidence of Blood Alcohol Tests
Defendant challenges the admissibility of the blood alcohol tests on the basis of the trooper's failure to have him "sign a standard form" advising him of his rights. La. R.S. 32:661 C. He does not contest the fact that the officer adequately apprised him of his rights, but only that the purportedly required "form" was not "signed".[1]
*297 Although the statute does refer to having a person "sign" a "form" and further provides that compliance with the statutory requisites is necessary for admissibility of the test results, we believe that there was substantial compliance in this case with the statutory scheme. Both the trooper and a physician testified that defendant voluntarily consented to the withdrawal of blood for testing. Defendant signed a "consent form", and he was orally advised (according to the officer) of the rights and consequences included in the "rights form" (which was unavailable and therefore not "signed"). In addition, defendant was subsequently provided with a "rights form" in conjunction with the PEI test that was administered later. The test was conducted (pursuant to the requirements of the statute and the regulatory agency) on blood drawn by a physician with a specially approved Department of Public Safety blood collection kit. Under these circumstances, we conclude that the absence of a signed "rights form" does not require application of the exclusionary provision of the statute.
Defendant also challenges the admissibility of the tests on the basis that he was too intoxicated to have "intelligently consented". The test for consent is whether the defendant acted voluntarily without coercion. See Schneckloth v. Bustamonte, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). The state need not establish an "intelligent waiver" of the statutory right to refuse the test, but need only show that he acted voluntarily. The trial court's findings in such matters are entitled to great weight and will not be overturned when supported by the record. Here, the testimony of the emergency room physician and the trooper were adequate to support the trial court's finding that defendant voluntarily agreed to the chemical tests.
The record also supports a finding that defendant was observed by the emergency medical technicians who transported him to the hospital and by the officer who administered the PEI for a period of in excess of 20 minutes, as required by the rules promulgated for the administration of the PEI test by the Department of Public Safety. The regulation does not require constant observation by one individual for the 20-minute period preceding testing, but only that the person be subjected to "general observation ... whereby the subject shall not have ingested alcohol, alcoholic beverages, regurgitated, vomited, or taken anything by mouth". Rule 4, Regulations of Louisiana Department of Public Safety, relative to Breath and Alcohol Analysis Methods and Techniques, Volume 6, No. 11, p. 660 (Nov. 1980). Also, the form introduced by the state in connection with the offering of the PEI test results reflects that a 20-minute period had elapsed during which defendant took nothing by mouth.
Jury InstructionsPresumption of Intoxication
Defendant complains that the trial court informed the jury of the "presumption of intoxication" and of their perogative to consider the violation of a statute as "presumptive evidence" of criminal negligence. He contends that such "piggybacking" of the two "presumptions" violates his right to require the state to prove criminal negligence beyond a reasonable doubt. See State v. Williams, 375 So.2d 931 (La. 1979).
This court in Williams held that the state cannot utilize the mandatory presumption of La.R.S. 32:661 in a negligent *298 homicide prosecution under La.R.S. 14:32, reasoning:
"In pragmatic result, this might have the effect of relieving the state of its constitutional burden of proving that the defendant driver was negligent at all, a necessary element of the crime which the state is required to prove beyond a reasonable doubt before subjecting the driver to the possibility of penitentiary imprisonment.
* * * * * *
"In view of the serious constitutional issues thereby presented, the trial court was properly concerned with constitutionally prejudicial effect which might arise from the introduction of the PEI test in connection with the linking or piggybacking in a negligent homicide prosecution of the presumptions provided by La.R.S. 32:662 and 14:32.
* * * * * *
"In the present instance, the presumption of intoxication while driving provided by La.R.S. 32:662 is a mandatory presumption, as defined by Ulster [County v. Allen, 442 U.S. 140, 99 S.Ct. 2213, 60 L.Ed.2d 777]the trier of fact must find that the accused was driving while intoxicated, unless he comes forth with exculpatory evidence believed by the trier, a virtually impossible burden as our jurisprudence notes.
"The practical effect of the mandatory presumption of being involved in a fatal vehicle accident as an intoxicated driver is to presume the criminal negligence and consequently the guilt of the defendant driver, when considered in connection with the other applicable presumption provided by La.R.S. 14:32 of criminal negligence arising from proven violation of a statute (even though we have held the latter to be merely permissive.)" 375 So.2d at 935. (Footnotes omitted.)
The trial court in the present case did refer to the presumption of intoxication in a negligent homicide case. However, the instruction, when viewed in its entirety, did not create the "linking" problem with which the court was concerned in Williams (which was decided in a pretrial context). Here, the trial judge gave a very strong instruction on the meaning of criminal negligence which clearly emphasized the jury's obligation not to convict merely on a simple finding of a statutory violation and a fatal accident. The judge said:
"Criminal negligence is an essential ingredient of the crime of Negligent Homicide. Criminal negligence is defined in Revised Statutes 14:12 as follows:
"`Criminal negligence exists when, although neither specific nor general criminal intent is present, there is such disregard of the interest of others that the offender's conduct amounts to a gross deviation below the standard of care expected to be maintained by a reasonably careful man under like circumstances.'
"To put it in another way, the term criminal negligence means gross negligence or recklessness such as to amount to a reckless disregard for one's own safety or the safety of others and a willful indifference to the consequences liable to follow. Criminal negligence means something more than mere carelessness, mistake, error of judgment or omission of duty. It means a degree of negligence more serious or aggravated than would ordinarily give rise to civil liability. It is more than the mere omission to do something which a reasonable and prudent man would do under the circumstances surrounding each particular case. Criminal negligence is such gross negligence or recklessness as might cause a reasonable and prudent man to expect that injury or damage to the person, property or rights of others might result from his negligent act. It is such gross negligence and recklessness as might exist if he willfully does an act when he knows it is likely or probable that injury or damage may result from the doing of the act. However, it is not necessary that there be an intent or will concurring in the negligence or omission which causes death, because if the act was intentional and with the purpose of *299 causing death or great bodily harm, then the offense would be murder or manslaughter instead of negligent homicide.
"The Statute defining the crime of negligent homicide as stated above provides that `the violation of a statute or ordinance shall be considered only as presumptive evidence of such negligence.'
"However, a finding that Defendant actually violated the statute or ordinance is only presumptive evidence. The fact that a person may have violated a statute or ordinance is not alone sufficient to warrant a finding of criminal negligence, but you may consider such violation as presumptive evidence along with the other facts of the case to determine whether Defendant's conduct was of such a nature as to constitute that degree of carelessness and recklessness which would constitute criminal negligence.
"LSA-R.S. 32:662 provides:
"`That when a chemical test is made of a person's blood or breath, and at the time of the taking of the breath test or blood sample test, there was .10 grams percent of alcohol in the person's blood, it shall be presumed that the person was under the influence of alcoholic beverages.'
"There is neither specific nor general criminal intent involved in negligent homicide. It is necessary for the State to prove beyond a reasonable doubt that the accused did that which he ought not to have done in a grossly negligent or reckless manner in such disregard of the interest of the deceased that the conduct of the accused amounted to a gross deviation from the standard of care expected to be maintained by a reasonably careful man under similar circumstances." (Emphasis supplied.)
Thus, the jurors were clearly apprised of their right to consider the statutory violation, along with all of the other facts, as evidence of criminal negligence, but were further instructed not to convict unless convinced beyond a reasonable doubt that the evidence satisfied the described standard of "gross recklessness". See State v. Hammontree, 363 So.2d 1364 (La.1978); Hammontree v. Phelps, 605 F.2d 1371 (5th Cir.1979).
Of extreme significance in this particular case is the fact that there was no real dispute that criminal (as opposed to "ordinary") negligence was involved. See State v. Jones, 298 So.2d 774 (La.1974). The only contested factual issue was the identity of the driver. In this context, we cannot say that the trial court's instruction misled the jurors in determining the guilt of the accused. We therefore conclude that defendant was not prejudiced because the court's instruction created the dangers of the "piggybacking" of the two "presumptions" expressed in Williams. See State v. Daranda, 388 So.2d 759 (La.1980) and State v. Green, 418 So.2d 609 (La.1982), in which this court affirmed negligent homicide convictions, although jurors were instructed concerning the presumption of intoxication.
Jury InstructionsDefinition of Reasonable Doubt
Defendant contends that the trial court erred in defining reasonable doubt. The trial court, in defining "reasonable doubt", stated:
"It is such a doubt as a reasonable man could seriously have. It is a serious, sensible doubt such as one could give a reason for."[2]
Defense counsel objected, contending that the instruction equated the concept with a "serious doubt".[3]
*300 Defining "reasonable doubt" is difficult and is not required by La.C.Cr.P. Art. 804. Nevertheless, this court has approved various efforts to define the concept and has only disapproved when, as in State v. McDaniel, 410 So.2d 754 (La.1982), the court was concerned that the definition could mislead the jury into applying an incorrect standard.[4]
In the present case, we conclude that the term "serious doubt", in the context of the overall instruction, did not mislead the jurors into believing that they should apply a standard requiring a "greater degree of uncertainty" than is required for a "reasonable doubt".
Sentence Review
The trial court imposed the maximum sentence. Although this court has stated that maximum sentences should normally be reserved for the "worst offenders" and the "worst cases", the record in this case justifies the most severe sentence authorized by law.
The degree of intoxication was extreme, and defendant's reckless behavior actually endangered the lives of many other people as he careened along the highway at an excessive speed and without regard to traffic control devices. Significantly, his record of alcohol-related traffic infractions began when he was a young teenager. Less than two years before the fatal wreck, defendant's driver's license was suspended for traffic infractions. He had previously failed to respond affirmatively to court-ordered participation in substance abuse programs. As the trial judge noted in imposing sentence, defendant has no dependents and no excuse for his conduct, and he surely should have contemplated that his conduct could cause severe injury. Despite defendant's youth, his prior history of drinking and driving, his wanton disregard for the probable consequences of his reckless driving, and the magnitude of the harm (the death of an innocent motorist) caused by his drunken driving in this case justify a maximum sentence.
Accordingly, the conviction and sentence are affirmed.
DIXON, C.J., concurs.
CALOGERO, J., concurs and assigns reasons.
DENNIS, J., dissents with reasons.
CALOGERO, Justice, concurring.
I read the majority opinion as stating that, at best for the defendant, harmless error occurred in this case when the trial judge, in his instruction, piggybacked the presumption of intoxication [La.R.S. 32:662] and the presumption that the violation of a statute is evidence of criminal negligence [La.R.S. 14:32]. This determination prompts me to concur rather than to dissent. However, I strongly disagree with the majority's assertion that the judge's "instruction when viewed in its entirety did not create the `linking' problem with which the court was concerned in Williams..."
The trial judge told the jury essentially that when a chemical test shows that there is over .10 grams percent of alcohol in a person's blood that person is presumed to be intoxicated. He also instructed the jury that driving while intoxicated is a statutory violation, and that violation of a statute is presumptive evidence of criminal negligence, an essential element of the crime of negligent homicide. The consequence of linking these two presumptions is that test results indicative of intoxication without more will support a negligent homicide verdict, and as we said in State v. Williams, 375 So.2d 931 at 933, 934 (La.1979), "this might have the effect of relieving the state *301 of its constitutional burden of proving that the defendant driver was negligent at all, a necessary element of the crime which the state is required to prove beyond a reasonable doubt before subjecting the driver to the possibility of penitentiary imprisonment."
NOTES
[1] La.R.S. 32:661 C provides:

"When a law enforcement officer requests that a person submit to a chemical test as provided for above, he shall first inform the person of the consequences of a refusal. In addition, the law enforcement officer shall have the person sign a standard form advising such person of his constitutional rights; the law enforcement officer shall have the person sign a separate form advising such person of the consequences of his refusal to submit to a chemical test, provided however that a single combination of the two forms may be used. If the person is unable or unwilling to sign the form, the law enforcement officer shall certify that such person was informed of his constitutional rights and was unable or unwilling to sign said form. If the above procedure is not complied with, the results of the test or any reference to it is inadmissible into evidence in any criminal action or proceeding arising out of acts alleged to have been committed while the person was driving or in actual physical control of a motor vehicle upon the public highways of this state while under the influence of alcoholic beverages." (Emphasis supplied.)
[2] The recommended instruction on reasonable doubt in the Louisiana Trial Judges' Benchbook (La.Judicial College 1980) is:

"While the state must prove guilt beyond a reasonable doubt, it does not have to prove guilt beyond all possible doubt. Reasonable doubt is doubt based on reason and common sense and is present when, after you have carefully considered all the evidence, you cannot say you are firmly convinced of the truth of the charge."
[3] He did not base his objection on the failure to read the statute charging the jury to give defendant the benefit of a reasonable doubt arising from the evidence or the lack of evidence. La. C.Cr.P. Art. 804. Therefore, he cannot urge this ground on appeal. La.C.Cr.P. Art. 841; State v. Sims, 426 So.2d 148 (La.1983). Compare State v. Mack, 403 So.2d 8 (La.1981).
[4] In McDaniel, this court held that use of the term "great uncertainty" in defining reasonable doubt when "viewed in the context of the whole charge ... overstate[d] the degree of uncertainty required for a reasonable doubt". 410 So.2d at 756.