796 So.2d 185 (2001)
STATE of Louisiana, Appellee,
v.
Harold D. HANSBRO, Appellant.
No. 35,027-KA.
Court of Appeal of Louisiana, Second Circuit.
September 26, 2001.
*188 Wilson Rambo, Counsel for Appellant.
Richard Ieyoub, Attorney General, Counsel for Appellee.
Paul J. Carmouche, District Attorney.
J. Thomas Butler, Traci Moore, Assistant District Attorneys.
Before WILLIAMS, PEATROSS and DREW, JJ.
DREW, J.
Harold D. Hansbro was convicted of second degree murder as charged by amended bill of indictment, and sentenced to life imprisonment, without benefit of probation, parole or suspension of sentence, as per statute. Defendant appealed the conviction and sentence. We affirm.

FACTUAL & PROCEDURAL BACKGROUND
The jury found the, defendant guilty of the October 1, 1998 beating death of Donald Smith. Hansbro, a resident of Arkansas, had been hitchhiking to Mississippi to find construction work in the aftermath of hurricane damage. In a shelter in Texarkana, he met Donnie Shaw, who was also hitchhiking to Mississippi. The two arrived in Shreveport on the morning of October 1, 1998. As they were walking along railroad tracks, the two came upon two men behind an abandoned ice house. The pair, Donald Smith and Robert Johnson, had made the loading dock area of the abandoned building their home. They greeted the two travelers and invited them to join them.
The rest of the morning was spent visiting and drinking beer. During the visit, Hansbro and Shaw asked for directions to get to I-49. Robert Johnson took the two men to the bus stop on the corner of Linwood and Texas Street, leaving Donald Smith behind. At approximately 1:00 p.m., Robert Johnson caught a bus to pick up a check, leaving Hansbro and Shaw waiting for their bus.
As the two waited, they discussed going back to either borrow or rob money from *189 Donald Smith. Hansbro testified it was Shaw who wanted to go back to rob Donald Smith, and Hansbro followed him. According to the trial testimony of Shaw, it was Hansbro who wanted to go back to get money from Donald Smith. Both agreed that they did go back to the abandoned ice house. When they arrived, Donald Smith was sitting on an old car seat, drinking.
Hansbro testified that as he watched, Shaw began to beat and rob Donald Smith. Hansbro further testified that as Shaw began stomping the victim with his feet, Hansbro walked away. Shaw testified that as he watched, Hansbro began to beat and rob Donald Smith, taking $20.00 from his pocket, and as Hansbro began stomping the victim with his feet, Shaw walked away. Both testified that the victim was still alive when they walked away. The two did not meet again until court.
The deputy coroner testified that Donald Smith died from multiple blunt trauma injuries to his head, which fractured his skull, pushing skull fragments into his brain, causing hemorrhaging in the brain. As a result of the hemorrhaging, the victim's brain began to swell, causing the area of brain connected with breathing and heartbeat to shut down. The victim also had linear fractures of all of his ribs, indicating that a person either fell on or stomped onto the victim's chest with enough force to cause the ribs on both sides to break in lateral lines at the same time. Having all of his ribs broken made it nearly impossible for the victim to properly breathe. The combination of brain and chest injuries resulted in the victim's slow death.
At approximately 6:00 p.m. on the same day, a Shreveport Police officer patrolling Southern Avenue noticed an automobile occupied by two men turn into the abandoned ice house. Suspicious, the officer investigated. One of the passengers was Robert Johnson coming back to check on his friend. As the officer approached the men, he noticed Robert Johnson standing over Donald Smith, who was in a sitting position bleeding. He was not moving. The officer thought the victim was gasping for breath, and called the fire department emergency unit. But, Donald Smith was apparently already dead.[1]
Robert Johnson told the officers that two men came into their camp, said they were hitchhiking south to look for work, and he took them to a bus stop to catch a bus. He provided the officers detailed descriptions of the men indicating that one was a veteran. The police department issued a "bolo" notice[2] for the two men.
About 3:30 a.m. on October 2, 1998, Shreveport Police Officer James Cromer was patrolling on Mansfield Road when he noticed a man in the parking lot of the "171 Club." The club had closed at 2:30 a.m., and Officer Cromer was concerned because of recent thefts in the area. As the officer approached the man to ask for his ID, he noticed that the man was intoxicated. He had a strong odor of alcohol, slightly slurred speech and was unsteady on his feet. The man produced ID, including a VA card identifying him as Harold Hansbro. He told Officer Cromer that he was on his way to Mississippi to find work with the hurricane damage, he had come to the bar with his brother, and his brother had left with a woman. He told the officer that he was waiting for his brother and did not have a place to go.
*190 Officer Cromer recalled the "bolo" notice, and stated Hansbro matched the description of one of the murder suspects, one of whom was a veteran traveling south looking for work. The officer told Hansbro he was being detained for an investigation, but did not tell him he was being investigated for a homicide. The officer radioed his supervisor, who contacted the detective handling the homicide of Donald Smith. Detective Andrews arrived on the scene between 4:00 and 6:00 a.m. The two officers agreed that Hansbro was a prime suspect in the homicide. The officers arrested Hansbro for public intoxication. Hansbro was handcuffed, and in the presence of Detective Andrews, Officer Cromer read the Miranda warning to Hansbro. Hansbro responded, "I guess I won't answer any questions."
The officer based the public intoxication charge on Hansbro's intoxicated state, the area he was in, that he was from out of town with no transportation or place to go, and that he needed time to sober up. At the time of the arrest, Hansbro still smelled of alcohol, was unsteady on his feet and had slightly slurred speech, although he was not incoherent. His clothing was not in disarray. He wasn't shouting or talking. He was not violent or aggressive, nor did he use boisterous or insulting language. He was cooperative. Detective Andrews suspected Hansbro of the homicide, but decided not to interview him about that crime due to his intoxicated condition.
Hansbro was brought to the jail at approximately 6:00 a.m. The procedure for a public intoxication arrest was to hold the intoxicated person in the holding cell (drunk tank) for four hours to allow the person to sober up. The intoxicated person would generally keep his street clothes on. At the end of four hours the person would be released, unless there were other pending charges or warrants.
After Hansbro was placed in the holding cell, Detective Andrews went back to the police station and put together a six-person photographic lineup and showed the photographic lineup to Robert Johnson. Mr. Johnson identified Hansbro as one of the persons he saw with the victim just prior to the homicide.
Around 10:00 a.m., Detective Andrews checked Hansbro out of jail and took him to his office to be interviewed by himself and Detective Jeter. Both detectives testified that Hansbro was sober at that time. Detective Andrews read Hansbro a Miranda warning, and asked him to sign the rights advice card which said that the interrogation was now for "investigation of a homicide." Hansbro didn't ask for an attorney, and indicated that he understood his rights. He then agreed to make a statement. There is no evidence in the record or allegations by Hansbro that he was coerced in any manner in making the statement.
Hansbro first denied knowing anything about the homicide. He stated that he and a friend had just gotten into town from Texarkana around 7:00 p.m., and had gone to the 171 Club, and that his friend had met up with a girl, left him at the club, and never came back. Detective Andrews next told Hansbro that an eyewitness placed him at the scene of the homicide, and that they had recovered "some evidence from the area" and they knew he had been behind the ice house. At that point Hansbro offered to cooperate if they would turn him loose and drop the charges. The detectives told him that if he was not directly involved in the homicide he would not be charged.
At that point Hansbro told the detectives that he had met Donnie Shaw in Texarkana, and they had hitchhiked into *191 Shreveport early that morning, October 1, 1998. They had then gone behind the ice house, where they met and drank with the victim and Robert Johnson. Thereafter Johnson left them at a bus stop. Hansbro then told the detectives that after Johnson had left, Shaw told him that he was going back to rob the victim. He was gone awhile, and when he came back to the bus stop he had blood all over his shirt. Hansbro said he asked Shaw what he had done, and Shaw said he had robbed the old man. They split up at that point, and Hansbro caught a ride to the 171 Club, where he was found.
At that point, the detectives advised Hansbro that he was under arrest for the homicide of Donald Smith. He was taken back to the jail, and at that time his clothes were taken and he was given jail coveralls. The detectives then went to get the results of the autopsy of the victim.
While waiting for the autopsy results, Detective Andrews received a telephone call from Eric Peck, who had been at the 171 Club the night before. He told the detective about meeting a man named Harold at the bar. When he told Harold he had had a bad day, Harold told him his day had been worse, and then told Peck how he had gotten into a fight and may have killed a man. The next morning, Peck read or heard news about a man beaten to death near Southern Avenue, and decided to call the police. The description of the man Peck met in the 171 Club matched the description of Hansbro.[3] The only difference was that the witness recalled "Harold" telling him he was looking for Hwy. 3132 to get to Dallas for work, instead of going to Mississippi.
At the autopsy, Detective Andrews was shown bruise imprints on the face and neck of the victim that appeared to have been made by the sole of a shoe. Detective Andrews recognized it as being similar to the sole of Hansbro's tennis shoes. Photographs and measurements were taken of the imprint. After the autopsy, the detectives went back and recovered Hansbro's clothing and shoes from the jail and took them to Officer Chrietzburg with the forensics department. The measurements of the pattern on the shoes and the bruising imprints matched. On the bottom of one of the shoes was found a stain Detective Andrews thought resembled blood. However, later analysis determined the stain not to be blood.
After taking the clothing to forensics, the detectives conducted a second interview of Hansbro. The detectives explained to Hansbro that the autopsy had revealed a bruising pattern on the victim's neck and face which matched the pattern on Hansbro's shoes, and there appeared to be a bloodstain on the shoes. At that point, Hansbro asked if they were sure that the bruise pattern matched his shoes. When the detectives answered yes, Hansbro answered to the effect, "I need an attorney, you've got me, I need an attorney." At that point the detectives ended the interview.
An examination of the pants by the forensics lab found five possible bloodstains on the blue jeans. Subsequent DNA testing of these stained jeans found two of the bloodstains to be consistent with the DNA of the victim, one to be consistent with the DNA of Hansbro, and two were consistent with a mixture of DNA from the victim and Hansbro. Expert testimony at trial established that there was a one in 12.1 quadrillion probability that the two stains attributed to the DNA of the victim could *192 have come from someone other than the victim.
Before trial Hansbro filed a motion to suppress statements, alleging that while in custody, Hansbro made inculpatory statements, and that such statements were the result of an unlawful arrest, and in violation of his privilege against self-incrimination and his right to counsel. Hansbro also filed a motion to suppress all clothing and shoes that were seized from him without a search warrant or probable cause. An evidentiary hearing was held on the motions to suppress on October 28, 1999, and the trial court denied the motions. On December 2, 1999, Hansbro sought pretrial a supervisory writ of review to this court, alleging the trial court had erred in denying his motions to suppress. On January 6, 2000, this court declined to exercise supervisory jurisdiction.
Hansbro testified he did not harm Donald Smith. He recounted how he and Donnie Shaw had met Donald Smith and Robert Johnson on the morning of October 1, 1999. According to Hansbro, while waiting for the bus, Shaw told him he was going to go back and "rob this old man." Hansbro further testified that after Shaw went back to the ice house, he was curious and worried, and started walking after him. As he approached, he saw Shaw breaking beer bottles over the victim's head. Hansbro testified that he walked over and tried to separate Shaw from Smith. When Shaw refused to stop beating Smith, Hansbro said he walked away. When asked how the distinctive waffle pattern of his shoe appeared as bruises on the neck and face of Donald Smith, Hansbro replied, "I have no earthly idea. I do not know."
Hansbro also had several family members and friends testify that he was not a violent person, and that he had no reason to rob because he had access to money through his family. The jury found Hansbro guilty of second degree murder. The trial court sentenced Hansbro to the mandatory sentence of life imprisonment, without benefit of probation, parole or suspension of sentence.

DISCUSSION

Sufficiency of Evidence and Post-Conviction Motions
The defendant argues that the state failed to prove beyond a reasonable doubt that he murdered Donald Smith, the witnesses were not credible, the circumstantial evidence did not exclude reasonable alternative hypotheses of his innocence, and his conduct was inconsistent with that of a person who had brutally murdered someone. The state argues that reviewing the evidence in a light most favorable to the prosecution, sufficient evidence was adduced to support the conviction of Hansbro.
La. R.S. 14:30.1 defines second degree murder, in pertinent part:
A Second degree murder is the killing of a human being:
(1) When the offender has a specific intent to kill or to inflict great bodily harm, or
* * *
(B) Whoever commits the crime of second degree murder shall be punished by life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence.
The first question is whether the murder of Donald Smith meets the requirements of second degree murder, i.e., does the evidence show that the murderer had the specific intent to kill or cause Donald Smith great bodily harm? The answer is clearly yes. The person or persons *193 who killed Donald Smith repeatedly beat and stomped him, causing multiple fractures of his skull, which resulted in fatal brain injuries. In addition, the person or persons broke all of his ribs, and stomped his neck and face with enough force to cause serious injuries to his face and neck. Any of those injuries would show an intent to kill or at least inflict great bodily harm.
The next question then becomes whether the state proved, beyond a reasonable doubt, that Harold Hansbro participated in the beating death of Donald Smith, with the specific intent to cause death or great bodily harm.[4]
As to the defendant's motion for post-verdict judgment of acquittal, La.C.Cr.P. art. 821 provides that a motion for post-verdict judgment of acquittal shall be granted only if the court finds that the evidence, viewed in a light most favorable to the state, does not reasonably permit a finding of guilty. This is a question of legal sufficiency. State v. Combs, 600 So.2d 751 (La.App. 2d Cir.), writ denied, 604 So.2d 973 (La.1992).
Concerning the defendant's motion for new trial, La.C.Cr.P. art. 851(1) provides that the court shall grant a motion for new trial whenever the verdict is contrary to the law and the evidence, i.e., that the evidence was insufficient to sustain the conviction. A motion for new trial presents only the issue of the weight of the evidence. Under this article the trial judge has wide discretion to determine the weight of the evidence. The refusal to grant such a motion is not subject to appellate review, except for error of law. State v. Mitchell, 26,070 (La.App.2d Cir.6/22/94) 639 So.2d 391, writ denied, 94-1981 (La.12/16/94), 648 So.2d 387.
The standard of appellate review for a sufficiency of evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Jackson v. Virginia, supra; State v. Bosley, supra. The Jackson standard is applicable in cases involving both direct and circumstantial evidence. An appellate court reviewing the sufficiency of evidence in such cases must resolve any conflict in the direct evidence by viewing that evidence in the light most favorable to the prosecution. When the direct evidence is thus viewed, the facts established by the direct evidence and inferred from the circumstances established by that evidence must be sufficient for a rational trier of fact to conclude beyond a reasonable doubt that defendant was guilty of every essential element of the crime. State v. Sutton, 436 So.2d 471 (La.1983); State v. Owens, 30,903 (La. App.2d Cir.9/25/98), 719 So.2d 610, writ denied, 98-2723 (La.2/5/99), 737 So.2d 747. This court's authority to review questions of fact in a criminal case is limited to the sufficiency-of-the-evidence evaluation under Jackson v. Virginia, supra, and does not extend to credibility determinations *194 made by the trier of fact. La. Const. art. 5, § 10(B); State v. Williams, 448 So.2d 753 (La.App. 2d Cir.1984).
Viewing the evidence in a light most favorable to the state shows the following facts which support the conviction of Hansbro for second degree murder:
1. Hansbro was at the scene of the homicide. Hansbro's own trial testimony places him at the scene when the victim received the fatal blows.
2. Hansbro had both his and the victim's blood on his pants. This was consistent with the state's evidence of Hansbro's beating the victim to death. Although the victim's blood could have gotten onto the pants during a rescue attempt, Hansbro, while testifying, never provided any explanation of how his own blood got mixed with the victim's blood on his pants.
3. The victim had imprints of Hansbro's shoe on his neck and face. The imprints were made with such force as to break bones and cause serious injuries. While testifying, Hansbro stated he had no earthly idea how his shoe imprint came to be on the victim's face and neck. In brief, Hansbro's counsel argues that it was reasonably possible that the imprint was made by Hansbro inadvertently stepping on the victim while trying to stop Donnie Shaw from hitting the victim. This argument does not address how Hansbro inadvertently stepped on the victim twice, or why Hansbro didn't explain the shoe imprints to the jury.
4. Donnie Shaw testified that he witnessed Hansbro beat up and rob the victim.
5. Hansbro admitted to Eric Peck at the 171 Club that he had beaten up and possibly killed someone.
6. Hansbro gave three different versions of the events, together with his inculpatory statements to the detectives, including "you've got me," when confronted with the shoe imprint evidence.
The bulk of Hansbro's sufficiency of evidence argument focuses on inconsistencies in the testimony of Donnie Shaw and Eric Peck. Clearly, some of the state's witnesses were less than model citizens. As to Eric Peck, Hansbro argues that his testimony was inaccurate as to how often he frequented the 171 Club, that he couldn't recall when he arrived or left the bar on the night he met Hansbro. Hansbro now argues, without evidence, that Peck's three DWI convictions put him in trouble with the law, and his call was merely an attempt to benefit himself with the Shreveport Police Department.
As to Donnie Shaw, Hansbro argues that his testimony is rife with inconsistencies, and that the evidence does not exclude Shaw killing Donald Smith. The jury heard the testimony, including the alleged inconsistencies by these and all the other witnesses. Hansbro's version could possibly have supported a finding that Donnie Shaw participated in the homicide. The jury heard all of the evidence now asserted by Hansbro, and chose to believe the version presented by the state. A reviewing court accords great deference to a jury's decision to accept or reject the testimony of a witness in whole or in part. State v. Bosley, supra. In the absence of internal contradiction or irreconcilable conflict with physical evidence, one witness's testimony, if believed by the trier of fact, is sufficient support for a requisite factual conclusion. State v. White, 28,095 (La. App.2d Cir.5/8/96), 674 So.2d 1018, writ *195 denied, 96-1459 (La.11/15/96), 682 So.2d 760, writ denied, 98-0282 (La.6/26/98), 719 So.2d 1048. The testimony of Shaw and Peck does not conflict with the physical evidence, and does not contain any internal contradictions as to any relevant facts. Their testimony, along with the rest of the evidence supports the jury's guilty verdict.
Hansbro further argues that the evidence fails to show that he had any motive for robbing or harming Donald Smith. As can be seen from La. R.S. 14:30.1, motive is not a required element of attempted second degree murder. However, the Louisiana Supreme Court has explained that absence of proof of a motive "may properly be considered as a circumstance mitigating against specific intent." State v. Williams, 93-2707 (La.3/11/94), 633 So.2d 147, 149. While robbery was suggested as the motive at trial and the jury was free to conclude that a motive was proven, we do not find that a demonstration of any such motive was required.
The evidence was sufficient to sustain a conviction for second degree murder under the basic first definition of the crime. The trial court did not err in denying Hansbro's motions for new trial and post-verdict judgment of acquittal.

Motions to Suppress
The defendant argues that he was illegally arrested for public drunkenness; therefore, all evidence arising from that arrest should be suppressed. The defendant further argues that the warrantless seizure of his shoes and clothing incident to his arrest for murder was illegal. Hansbro contends the statements made by him during interrogation were obtained during a period of illegal detention or obtained in violation of his right to cut off questioning, and should have been suppressed. Finally, defendant urges the state did not establish a proper foundation of chain of custody of the bloodstained pants, and that they should not have been admitted as evidence.
The state argues that the defendant was properly arrested for public drunkenness, and the Shreveport Police Department had probable cause to later arrest the defendant for the charge of first degree murder. The shoes and clothing were seized incident to that arrest. The state further argues that the statements by the defendant were properly obtained. The state further argues that the sufficiency of the chain of custody of the bloodstained pants is an issue of weight of evidence, and not admissibility.
Section 50-152 of the Shreveport City Code provides, in pertinent part: "it shall be unlawful for any person to be intoxicated on the streets of the city, in any public place within the limits of the city, or at any public dance or any public gathering in the city."
Hansbro was originally arrested for public drunkenness under the foregoing ordinance. Hansbro argues that the premises of a tavern does not fall within the definition of a "public place" as used in section 50-152 of the Shreveport City Code. He further argues that unlike a public park, access to a tavern is restricted by statutes, ordinances and regulations as well as the rules of the proprietor, and to make a tavern a public place would make it a crime to get drunk at a tavern.
This court has held that a "public place" is "a place to which the general public has a right to resort, not necessarily a place devoted solely to the uses of the public, but a place which is in point of fact public rather than private, a place visited by many persons and usually accessible to the neighboring public." State v. McCoy, 546 So.2d 240, 243 (La.App. 2d Cir.1989). It should be noted that Hansbro was found *196 intoxicated outside of the tavern, in the parking lot, well after the tavern had closed. A parking lot is usually accessible to the neighboring public, and would be a public place under the City of Shreveport public intoxication ordinance. When stopped, Hansbro himself provided the officer evidence that he was intoxicated and a transient with no place to stay the night. The arresting officer testified at trial that the use of the public drunkenness ordinance is generally limited to cases, such as this one, where a person is found intoxicated in public with no place to go to safely sober up. The officer clearly had probable cause to arrest Hansbro for public intoxication. This complaint as to the legality of the arrest for public drunkenness is without merit.
Hansbro next argues that there was not sufficient probable cause to arrest him for murder, and to seize his clothing. Probable cause for an arrest exists when facts and circumstances known to the arresting officer, and of which he has reasonably trustworthy information are sufficient to justify a man of ordinary caution in the belief that the person to be arrested has committed a crime. State v. Wilson, 467 So.2d 503 (La.1985), U.S. cert. denied; State v. White, 543 So.2d 124 (La.App. 2d Cir.1989). The measure of probable cause to arrest is not that a police officer has proof sufficient to convict. State v. Scott, 389 So.2d 1285 (La.1980). Probable cause is determined by the setting in which the arrest took place, together with the facts and circumstances known to the arresting officer for which he might draw conclusions warranted by his training and experience. State v. Johnson, 422 So.2d 1125 (La.1982).
In this case, the officers had evidence of the victim being brutally beaten to death. Robert Johnson identified Hansbro as one of the persons with the victim immediately prior to the time he would have been attacked. Eric Peck called the police and told them of a "Harold" that admitted to him the night before, at the bar at which Hansbro was arrested, that he had beaten and maybe killed a man. The description of that "Harold" matched the description of Hansbro. The autopsy discovered a pattern of bruising imprints that appeared to one officer to match the pattern of Hansbro's shoes. Hansbro initially lied to the officers and denied knowing anything about the homicide. Hansbro then admitted to the officers that he was present at the crime scene, but it was Donnie Shaw who robbed and beat the victim. The officers had probable cause to believe, at a minimum, that Hansbro was an accessory to robbery and homicide.
Once Hansbro was arrested for murder, his clothing was removed and he was placed in jail clothing. His clothing became evidence in the homicide investigation, and the officers had legal justification to remove it from the jail and examine it for bloodstains. A warrantless search of a person, his clothing and the immediate area within such a person's control is justified following a lawful arrest. See Chimel v. California, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969); State v. Wilson, supra.
At the motion to suppress hearing, the trial court made the determination that the arrests were lawful. The trial court's factual findings during a hearing to suppress evidence are entitled to great weight and should not be disturbed unless they are clearly erroneous. State v. Clark, 446 So.2d 293, (La.1984). On review, there exists no reason to disturb the factual finding by the trial court that Hansbro was legally arrested for public drunkenness as well as murder, and that his clothing was lawfully seized incident to those arrests.
*197 Next, Hansbro argues that the officers did not honor his right to cut off questioning. The record shows that Hansbro was arrested on the public drunkenness charge. Upon his arrest for that charge, he was read his Miranda warning as to that charge. At that time he told the officers, "I guess I won't answer any questions." As Hansbro sat in the "drunk tank", the officers began to receive additional evidence that he had been involved in the homicide of Donald Smith. About four hours after his arrest, the officers brought Hansbro back to the station, and informed him that they were investigating him for the homicide of Donald Smith. At that time, they again read him his Miranda rights from a rights card, which stated "investigation for homicide." Hansbro signed this card. This was done to comply with La.C.Cr.P. art. 218.1, which provides:
When a person has been arrested or detained in connection with the investigation or commission of any offense, he shall be advised fully of the reason for his arrest or detention, his right to remain silent, his right against self incrimination, his right to the assistance of counsel and, if indigent, his right to court appointed counsel.
After this second reading of rights, Hansbro chose to make a statement. He first lied and told the detectives that he knew nothing of the homicide. When confronted with evidence that placed him at the scene of the crime, Hansbro asked if he made a statement, would they let him go. He then changed his story and told the detectives that Donnie Shaw went back to the ice house alone to rob Donald Smith, and came back with blood on his shirt. The record does not contain any evidence, nor is it alleged that Hansbro was coerced or intimidated into making this statement or that he did not understand the rights read to him.
La. R.S. 15:451 provides:
Before what purposes [purports] to be a confession can be introduced in evidence, it must be affirmatively shown that it was free and voluntary, and not made under the influence of fear, duress, intimidation, menaces, threats, inducements or promises.
La. C.E. art. 703(D) provides:
D. On the trial of a motion to suppress filed under the provisions of this Article, the burden of proof is on the defendant to prove the ground of his motion, except that the state shall have the burden of proving the admissibility of a purported confession or statement by the defendant or of any evidence seized without a warrant.
Because the credibility of witnesses plays a key role in the determination of voluntariness, a reviewing court will defer to the ruling of the trial court in such matters unless that ruling is inadequately supported by reliable evidence. State v. Seals, 95-0305 (La.11/25/96), 684 So.2d 368, 380, U.S. cert. denied 520 U.S. 1199, 117 S.Ct. 1558, 137 L.Ed.2d 705.
In State v. Tolbert, 30,821 (La.App.2d Cir.8/19/98), 716 So.2d 949, writ denied, 98-2562 (La.1/15/99), 736 So.2d 207, this court held:
When a defendant invokes his constitutional right to silence, the validity of any subsequent waiver depends upon the "scrupulous honoring" of that right by the police. Whether an accused's rights are "scrupulously honored" depends on the totality of the circumstances involved under the particular facts of each case. One factor to be considered is who initiates the further questioning. Other factors include "the time delay between the original request and subsequent *198 interrogation, whether Miranda warnings were given before each separate interrogation, whether waiver of rights forms were signed, and whether or not pressures were asserted on the accused by the police between the time he invoked his right ... and the subsequent interrogation."
Citations omitted. See also Michigan v. Mosley, 423 U.S. 96, 102, 96 S.Ct. 321, 326, 46 L.Ed.2d 313 (1975)
Hansbro was originally Mirandized for the crime of public intoxication. His response was, "I guess I won't answer any questions." The evidence of the defendant's invocation of his right to silence, if his actions can be so characterized, was equivocal, since it could be interpreted that Hansbro was not sure if he would answer questions. Because of the uncertain scope of the defendant's initial silence, the officers were aware that Hansbro had refused to make a statement on the charge of public intoxication, but there is no evidence that he intended this silence as a blanket refusal to speak to police about any subsequent charges.
The evidence shows that the police scrupulously honored Hansbro's request not to be questioned about his public intoxication charge. The police also did not ask him about his suspected role in the homicide. Four hours later, the police advised Hansbro that he was being investigated for homicide. He was again read his rights, and he signed a rights card. There is no evidence of pressure or coercion in this interview. There is no evidence that the detectives badgered, threatened or questioned Hansbro in any manner between the first and second reading of rights.
It is also significant that after a second reading of rights, and full notice of the gravity of the possible charge he was facing, Hansbro elected to waive those rights, and make a statement. The investigating officers "scrupulously honored" Hansbro's right to remain silent, and his subsequent statements were made after a free and voluntary waiver of those rights. Hansbro has not shown that the trial court erred in finding the statements to be free and voluntary, and in denying the motion to suppress, despite his Mosley complaint.
Next, Hansbro argues that his blue jeans should not have been admitted at trial because the evidence was not properly authenticated by a complete chain of custody, by unique marking or other reliable method. Hansbro argues that no one testified that they took the jeans from Hansbro.
To admit demonstrative evidence at trial, the law requires that the object be identified, either by testimony that the object is related to the case or by the chain of custody from the time of seizure until presentation at trial. State v. Toney, 26,711 (La.App.2d Cir.3/1/95), 651 So.2d 387; State v. Sweeney, 443 So.2d 522 (La.1983). The law does not require that the evidence as to custody eliminate all possibilities that the object has been altered. The state need only establish by a preponderance of the evidence that the object is the one connected with the case. Id. A defect in the chain of custody goes to the weight of the evidence rather than to its admissibility. State v. Jackson, 629 So.2d 1374 (La.App. 2d Cir.1993), writ denied, 94-0201 (La.05/06/94), 637 So.2d 1046.
During the trial, the state elicited testimony from the jailer who testified about the procedures of taking clothing and personal effects of prisoners. The investigating deputies testified that they went to the jail to get Hansbro's pants and shoes. The officers with forensics testified about receiving and testing the pants for blood and DNA. Hansbro testified and did not dispute *199 that the pants were his. The failure of the state to produce the officer who actually took the evidence off of a defendant does not bar admissibility, particularly in cases where the defendant then testifies about that evidence. See State v. Bryant, 29,344 (La.App.2d Cir.5/7/97), 694 So.2d 556. The state properly established by a preponderance of the evidence that the pants, stained with blood from Hansbro and the victim, offered at trial were the ones seized from Hansbro upon his arrest on October 2, 1998. The testimony of the officers, together with the DNA tests and the defendant's testimony, was sufficient to establish the connection of the pants with the defendant.

Excessive Sentence
The defendant argues that the matter should be remanded because of the trial court's failure to take cognizance of the criteria set forth in La.C.Cr.P. art. 894.1.
Hansbro further argues that the mandatory sentence of life imprisonment was excessive, and the sentencing should be remanded because the trial court failed to order a PSI or consider the factors of La.C.Cr.P. art. 894.1. In the state's view, life imprisonment for second degree murder is not constitutionally excessive, especially in light of the facts of this crime. Hansbro also argues that the trial court failed to comply with La.C.Cr.P. art. 894.1 in imposing the sentences.
The defendant did not file a motion to reconsider sentence. When a defendant fails to file a La.C.Cr.P. art. 881.1 motion, the appellate court's review is limited to the bare claim that the sentence is constitutionally excessive. State v. Mims, 619 So.2d 1059 (La.1993); State v. Duncan, 30,453 (La.App.2d Cir.2/25/98), 707 So.2d 164. Constitutional review turns upon whether the sentence is illegal, grossly disproportionate to the severity of the offense or shocking to the sense of justice. State v. Lobato, 603 So.2d 739 (La.1992).
In State v. Jones, 31,613 (La.App.2d Cir.4/1/99), 733 So.2d 127, writ denied, 99-1185 (La.10/1/99), 748 So.2d 434, this court addressed the issue of mandatory sentences and compliance with La.C.Cr.P. art. 894.1, as follows:
Failing to articulate reasons for the sentence as set forth in La.C.Cr.P. art. 894.1 when imposing a mandatory life sentence is not an error. Articulating reasons or factors would be an exercise in futility since the court has no discretion.
Whether a sentence imposed is too severe depends on the circumstances of the case and the background of the defendant.[5] Hansbro was convicted of second degree felony murder, the penalty for which is life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence.
It is within the legislature's authority to determine the length of the sentence imposed for crimes classified as felonies, and the courts are charged with applying these punishments unless they *200 are found to be unconstitutional. State v. Armstrong, 32,279 (La.App.2d Cir.9/22/99), 743 So.2d 284, writ denied, 99-3151 (La.4/7/00), 759 So.2d 92. The jurisprudence requires that the trial court presume that a mandatory minimum sentence is constitutional and that it does not impose excessive punishment. State v. Johnson, 97-1906 (La.3/4/98), 709 So.2d 672; State v. Juarez, 624 So.2d 26 (La.App. 2d Cir.1993).
In Johnson, supra, the Louisiana Supreme Court stated:
[T]o rebut the presumption that the mandatory minimum sentence is constitutional, the defendant must clearly and convincingly show that: [h]e is exceptional, which in this context means that because of unusual circumstances this defendant is a victim of the legislature's failure to assign sentences that are meaningfully tailored to the culpability of the offender, the gravity of the offense, and the circumstances of the case.
In the instant case, the defendant has failed to present any evidence to show that his particular circumstances warrant a departure from the legislatively mandated sentence. Considering the defendant's conviction for the brutal murder of a helpless man for a very small amount of money, a life sentence does not shock the sense of justice. There exists absolutely no abuse of the trial court's great discretion in sentencing this defendant to life imprisonment which is appropriate under these facts.

Error Patent
A review of the record reveals that the defendant was originally charged by grand jury indictment with first degree murder. He was later charged with second degree murder by an amended indictment, which was signed by the district attorney, but not endorsed a true bill by the grand jury foreman. The defendant was tried for second degree murder and found guilty as charged.
La.C.Cr.P. art. 382(A) provides in part that a prosecution of an offense punishable by death or life imprisonment shall be instituted by grand jury indictment. Second degree murder is punishable by life imprisonment. La. R.S. 14:30.1(B). Therefore, the defendant's prosecution for second degree murder should have been instituted by a grand jury indictment.
However, district attorneys are empowered to amend indictments to charge lesser offenses. State v. Gilmore, 332 So.2d 789 (La.1976). The state may abandon the charge of a greater crime and proceed with prosecution for the lesser crime and no formal indictment is necessary for that purpose. State v. Edwards, 287 So.2d 518 (La.1973). Thus, the district attorney had the power to amend the charge to second degree murder without a formal indictment.
In any event, the defendant did not file a pre-trial motion to quash based on this ground, as per La.C.Cr.P. art. 533(5). Thus, even though the lack of a "true bill" endorsement is an error patent, the error is waived due to the defendant's failure to file a motion to quash before trial. La. C.Cr.P. art. 535(C); State v. Miller, 98-642 (La.App. 3d Cir.10/28/98), 720 So.2d 829, writ denied, 98-3119 (La.5/14/99), 741 So.2d 659.

DECREE
The defendant's conviction and sentence are AFFIRMED.
NOTES
[1] The deputy coroner testified that the victim had died up to 45 minutes earlier and the gasping for breath was probably gas escaping from the lungs.
[2] "Be on the lookout."
[3] On October 6th Detective Andrews conducted a six-person lineup with this witness, and he identified Hansbro as the Harold he met in the 171 Club on October 1st.
[4] When issues are raised on appeal both as to the sufficiency of the evidence and as to one or more other trial errors, the reviewing court should first determine the sufficiency of the evidence. The reason for reviewing sufficiency first is that the accused may be entitled to an acquittal under Hudson v. Louisiana, 450 U.S. 40, 101 S.Ct. 970, 67 L.Ed.2d 30 (1981), if a rational trier of fact, viewing the evidence in accord with Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), in the light most favorable to the prosecution, could not reasonably conclude that all of the elements of the offense have been proved beyond a reasonable doubt. State v. Hearold, 603 So.2d 731 (La.1992); State v. Bosley, 29,253 (La.App.2d Cir.4/2/97), 691 So.2d 347, writ denied, 97-1203 (La.10/17/97), 701 So.2d 1333.
[5] A sentence violates La. Const. art. 1, § 20, if it is grossly out of proportion to the seriousness of the offense or nothing more than a purposeless and needless infliction of pain and suffering. State v. Dorthey, 623 So.2d 1276 (La.1993); State v. Bonanno, 384 So.2d 355 (La.1980). A sentence is considered grossly disproportionate if, when the crime and punishment are viewed in light of the harm done to society, it shocks the sense of justice. State v. Hogan, 480 So.2d 288 (La. 1985); State v. Bradford, 29,519 (La.App.2d Cir.4/2/97), 691 So.2d 864. A trial court has wide discretion to sentence within the statutory limits. Absent a showing of manifest abuse of that discretion, this court will not set aside a sentence as excessive. State v. Square, 433 So.2d 104 (La.1983); State v. Washington, 29,478 (La.App.2d Cir.4/2/97), 691 So.2d 345.