974 So.2d 667 (2007)
STATE of Louisiana, Appellee
v.
Courtney BEANER, Appellant.
No. 42,532-KA.
Court of Appeal of Louisiana, Second Circuit.
December 5, 2007.
*669 Louisiana Appellate Project by Annette F. Roach; for Appellant.
Courtney Beaner, Pro se.
Paul J. Carmouche, District Attorney, Dale G. Cox, John Ford McWilliams, Jr., Assistant District Attorneys, for Appellee.
Before STEWART, PEATROSS and LOLLEY, JJ.
STEWART, J.
The defendant, Courtney Beaner, was convicted of two counts of second degree murder. The district court imposed the mandatory sentence of life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence for each count, with the sentences to run concurrently. The defendant now appeals. Finding no merit in the defendant's claims, we affirm his convictions and sentences.

FACTS
On October 10, 2002, during a pep rally at Woodlawn High School ("Woodlawn"), there was an exchange of threats between members of two gangs, one from the Hollywood *670 Heights area of Shreveport and the other from the Cedar Grove area. Those involved were removed from the rally by school officials.
The following Monday, October 14, 2002, a gunfight broke out between members of the two gangs at Woodlawn as the school day ended. Multiple gunshots were fired from a vehicle driving past the school and a student, Jonathan Guiden, was shot in the leg. Marquell Chambers (identified with the Hollywood group) was later identified as the shooter and arrested.
Later that afternoon, the defendant and some other individuals from the Cedar Grove area, including Carlton Brooks, Phillip Brown, Aaron Wallpool and Jemarcus Monroe, were gathered outside Wallpool's home located at Wallace and West 76th Street. When a Lincoln automobile containing some of the Hollywood group, including Tony Taylor and Jermichael Lewis, drove past, there was an exchange of gunfire between the vehicle occupants and the group standing in front of the West 76th Street house. No one was injured in the shooting.
At approximately 5:30 p.m. that evening, LaDonna Austin returned from work to the Lexington Street home she shared with her sister, LaDorothy Austin, who was there with Brooks, her live-in boyfriend. Also present were the defendant, Phillip Brown, Wallpool, Shamichael Tillman, Arethea Brown and Monroe. Defendant and the others were heard discussing the fight at Woodlawn and making a plan to retaliate against Randy Wilson, who they said was a member of the Hollywood group which had fired shots at them earlier at West 76th Street. Some of the group dressed in black clothing and drove away in a white Honda vehicle.
At approximately 9:00 p.m., Ronnie Chambers drove to a house located at the corner of Oakdale and Ledbetter Streets in Shreveport to pick up his 15-year-old sister, Chiquita Chambers.[1] Their brother Marquell had been arrested earlier for the shooting at Woodlawn. Members of the Hollywood group typically gathered at the house, which was approximately one block away from Hattie Perry Park. At the time, several individuals were standing in the yard, including Randy Wilson and Jermichael Lewis.
A short time later, a white Honda sedan with a sunroof and tinted windows drove by the house. Chiquita was standing in the street behind Ronnie's car when occupants of the Honda began firing numerous shot from the sunroof and rear windows of the car toward those gathered in the yard. Chiquita and Lewis both suffered fatal gunshot wounds, and Randy Wilson was shot in the left arm.
Police later recovered the white Honda sedan, which had been stolen the night before the shooting and burned afterward. After interviewing a number of witnesses, police sought to search the Lexington Street house. While police waited outside the Lexington Street house for a search warrant, the defendant and others pulled up to the house in a car and they were apprehended and taken into custody. After a search of the home, police seized ammunition, a Lorcin .380 caliber semiautomatic pistol and a Bryco .380 semiautomatic pistol that were found in the bedroom shared by LaDorothy and Brooks.
The crime scene investigation yielded numerous .380 and .40 caliber shell casings. *671 Richard Beighley, a firearms expert with the Northwest Louisiana Criminalistics Laboratory, tested the bullets recovered from the bodies of the victims and bullets fired from the two handguns seized from the Lexington Street home. Beighley concluded that the bullet recovered from Chiquita's body was fired from the Bryco .380 and determined that six of the .380 caliber casings recovered from the crime scene were fired from the Bryco pistol. He also determined that five additional .380 caliber casings recovered from the crime scene were fired from the Lorcin pistol. Beighley further concluded that the bullet recovered from Lewis' body was fired by a .40 caliber semiautomatic pistol, as were six .40 caliber shell casings found at the scene.
Subsequently, the defendant was charged with two counts of second degree murder. A jury unanimously found defendant guilty as charged on count 1 (Chambers' murder), and found defendant guilty as charged on count 2 (Lewis' murder) by a 10-2 vote. The district court imposed concurrent life sentences at hard labor without benefit of parole, probation or suspension of sentence. Defendant now appeals.

DISCUSSION
Motion To Suppress
The defendant contends that the trial court erred in denying the Motion to Suppress Statements. Arguing that he was not adequately advised of his rights and he did not have the mental capacity to understand his Miranda rights, he asserts that there was no intelligent and knowing waiver. He claims that he was not given sufficient time and explanation about his Miranda rights, and that he is a mentally retarded 18-year-old who can barely read and cannot comprehend more than one idea at a time.
The state argues that the record supports the trial court's findings that Beaner was expressly read his Miranda rights and that he had the mental capacity to understand his constitutional rights for purposes of making a voluntary, knowing and intelligent waiver, as evidenced by the defendant's stated and apparent understanding of his rights at the time of his statements, his ability to give chronological details about the events of the crime, his changed stories, his ability to change language between "street slang" and more articulate language, and the expert testimony and evaluations of Beaner concerning his mental capacity.
Beaner's motion to suppress was presented before two different judges at two different hearings, and testimony was adduced at both motions.
Judge Jeanette Garrett heard the first motion. At this hearing, testimony was taken from Detectives Sean Hindenberger and Jeff Brown of the Shreveport Police Department, as well as from Beaner pursuant to La. C. Cr. P. art. 703(E).
Detective Hindenberger testified that he and Brown first interviewed the defendant at 11:05 p.m. on October 16, 2002. This first interview was not recorded. Before advising Beaner of his Miranda rights and prior to questioning him about the crime, Hindenberger asked Beaner the highest grade he completed in school. Beaner responded the 12th grade and said that he had graduated. Hindenberger also asked Beaner if he knew how to read and write, to which Beaner responded yes. Both detectives testified that Beaner did not appear to be under the influence of any alcohol or drugs, and Beaner told the detectives he was not under the influence.
Detective Hindenberger gave Beaner a written copy of the Miranda rights card and asked Beaner to read along with him. *672 Hindenberger read the first paragraph to Beaner, which advised Beaner of his Miranda rights, and at the conclusion, asked Beaner if he understood those rights. Beaner said yes. Hindenberger proceeded to read the second paragraph of the card concerning whether Beaner wished to waive those rights. After reading the paragraph, Hindenberger asked if he wanted to waive the rights and make a statement. Beaner said yes and signed the form. Beaner denied any involvement in the shooting and gave the detectives an alibi, saying that he was with a man named Saul Williams playing solitaire on the computer and watching TV. The first interview lasted about 30 minutes. At the conclusion of the interview, Hindenberger told Beaner he was under arrest for first degree murder. Hindenberger also read, Beaner the "Epithelial Cells Consent Form" and asked Beaner if he was willing to consent to a swab of his mouth for DNA. Beaner consented to the swab and signed the form by printing his name. The swab was taken at approximately 11:30 p.m.
The detectives next interviewed Jemarcus Monroe, an occupant of the car in the drive-by shooting. Approximately two hours after the initial interview, Detective Hindenberger told Beaner he had spoken to Monroe and asked Beaner if he was "ready to tell the truth." Beaner said "yes."
At 1:05 a.m. on October 17, 2002, Detectives Hindenberger and Brown conducted a second interview with Beaner. This interview was recorded. Once again, Hindenberger asked Beaner the highest grade he completed in school, whether he could read and write, and whether he was under the influence. Beaner gave the same answers as before. Once again, Hindenberger advised Beaner of his Miranda rights, which Beaner acknowledged that he understood. Once again, Beaner told the detectives that he wanted to waive those rights and make a statement. He signed the card by printing his name.
Beaner proceeded to give a detailed account of the events of the night of the shooting. He admitted that he was in the car and that he participated in the shooting. Beaner also told the detectives the make, model and type of gun he used. Finally, Beaner admitted that he told detectives he was not forced or coerced into making the statement and that he gave the statement voluntarily. Detective Brown corroborated Detective Hindenberger's testimony about the interviews. Both detectives testified that they had no reason to think that Beaner did not understand his Miranda rights.
At the suppression hearing, Beaner admitted that he told the detectives he understood his Miranda rights but testified that he did not really understand the rights and that he did not know how to read. Beaner also testified at the suppression hearing that he gave the statements because Hindenberger promised to release him if he agreed to talk; Hindenberger denied making any such promise. At no time did Beaner ask for a lawyer or ask to stop the interviews.
The state also introduced the psychiatric reports of Dr. Dean Robinson and Dr. Greg Brown, which were previously prepared for purposes of a sanity commission to determine whether Beaner was competent to stand trial. These reports indicated that Beaner understood the nature of the charges, the seriousness of the charges, and the defenses available to him. While Beaner was believed to have "low intellectual functioning," he was not diagnosed as mentally retarded. However, his IQ was barely above the borderline for being deemed mildly retarded.
*673 On January 26, 2004, after considering the testimony and evidence adduced at the January 21, 2004, hearing, Judge Garrett denied the motion finding that Beaner was fully and adequately advised of his Miranda rights and that he knowingly and intelligently waived his rights. Judge Garrett concluded that the sanity commission reports, when read in whole, showed that Beaner was able to fully understand his rights and had the capacity to make a knowing, intelligent and voluntary waiver. Judge Garrett expressly noted that, based on her observations of Beaner, he seemed to be "playing possum with the Court" and that she did not believe his "act" that he was unintelligent. She alluded to Beaner's demeanor on the stand; and his explanation on the stand of the reason for a DNA swab, noting that Beaner knew that the police were going to take it to the scene and see if he had left any DNA. Also noteworthy was Beaner's ability to give a complete, detailed, chronological account of the facts surrounding the events of the shooting.
On July 18, 2005, Beaner re-urged his motion to suppress based on newly discovered evidence indicating that Beaner may have sustained brain damage at birth. Judge Crichton heard this motion. At the second suppression hearing, expert testimony was taken from the two doctors previously appointed to the sanity commission as well as from Beaner's psychologist, Dr. Mark Vigen. Beaner did not testify at the second suppression hearing.
After reviewing Beaner's hospital birth records, Dr. Vigen, an expert in the field of clinical psychology, testified that Beaner suffered from mild hydrocephalus (increased intracranial fluid) and mild intracranial bleeding at the time of his birth. He testified that while it is common to have mental retardation given these problems at birth, there is not a "one for one correlation" between Beaner's birth problems and his mental capacity.
Dr. Vigen also reviewed Beaner's school records. Dr. Vigen noted that as Beaner progressed in school, he fell progressively further behind, which is consistent with someone suffering from mental retardation. He noted that Beaner received a "certificate of achievement" and was not a regular graduate from high school. Dr. Vigen concluded that Beaner has the academic and intellectual development of an eight-year-old. Notwithstanding his diminished mental capacity, Beaner was able to understand information that is read to him at a third grade level.
In testing conducted by Dr. Vigen, Beaner scored a verbal IQ of 62, a performance IQ of 73, and a full scale IQ of 63. Because this lower range IQ suggested possible mental retardation, Dr. Vigen also administered a CAST MR examination, which is a multiple choice test regarding legal concepts, generally used for purposes of determining competency to stand trial. Beaner passed the test, scoring 39 out of 50. A score of 25.6 or greater means that Beaner is competent to stand trial. Dr. Vigen admitted that mental retardation, standing alone, does not mean that an individual is not competent to stand trial. However, he also noted that Beaner did not sufficiently pass all competency tests, such as the sequence completion test.
With respect to the Miranda rights that were read to Beaner by police on October 16-17, 2002, Dr. Vigen testified that although he believed it would be difficult for someone having Beaner's mental capacity to understand the Miranda concepts, he could not offer an opinion whether Beaner understood the meaning of his rights at the time he was questioned. Dr. Vigen conceded that Beaner's changed story indicated that Beaner had the capacity to *674 deceive police and that this deception could mean that Beaner understood that the police posed a risk to him if he cooperated. In Dr. Vigen's opinion, Beaner will often do what he is told to do. Dr. Vigen qualified his opinion about Beaner's lack of understanding of the Miranda rights as follows:
If I'm going do [sic] err, I want to err on his side in the sense of saying, I think that he, more likely than not, didn't understand because this is a  this Miranda warning is an abstract warning, it's a conceptual warning. It requires a lot of understanding, a lot of teaching, and I don't know that most third graders, you know, or eight year olds are going to understand it, if it hasn't been explained to them. But do I know that definitely? No, I don't. Do I have a strong opinion? No, I don't. But I'm going to err  or I have to err, I'm going to err in that direction because of [Beaner's] background.
He acknowledged, however, that Beaner's responses to an evaluation conducted by Dr. Goebel indicated that Beaner had a rudimentary understanding that he did not have to talk to police unless he chose to do so. He also admitted that people with Beaner's mental capacity often have good "street smarts."
Dr. Greg Brown testified that Beaner had the mental capacity to proceed to trial and that he was able to understand his Miranda rights and waive them. Dr. Brown reviewed the testing results conducted by Dr. Vigen and concluded that while Beaner's overall IQ of 63 placed him in the "mild mental retardation range," Beaner clearly demonstrated that he understood what he had done and that he knew it was not right. Indeed, Beaner told Dr. Brown that he wanted to negotiate some type of plea bargain so as not to go to prison for the remainder of his life. In Dr. Brown's opinion, a full scale IQ of 63 put Beaner's cognitive and educational abilities when he was age 19 at the level of a 13-year-old. Importantly, Dr. Brown testified that Beaner told him in July 2003 that he understood his Miranda rights when Dr. Brown interviewed him for purposes of determining competency to stand trial.
Dr. Dean Robinson, an expert in the field of psychiatry, who was a member of the sanity commission that examined Beaner, opined that Beaner had the mental capacity to understand his Miranda rights but that it would take him longer to understand those rights than the average person. Dr. Robinson testified that after review of Beaner's birth records and Dr. Vigen's results, he diagnosed Beaner as suffering from borderline or mild mental retardation most likely resulting from the hydrocephalus and intracranial bleeding at birth.
When Dr. Robinson gave his opinion at the hearing, Dr. Robinson was unaware that Beaner had originally denied any involvement in the shootings when he was first interrogated. Dr. Robinson opined, however, that if those were the facts, the initial denial showed Beaner realized he was in trouble and he responded accordingly by denying involvement. Dr. Robinson noted that Beaner gave appropriate answers on many questions, and that he changed his language from street slang to more articulated words during the course of the interrogation. This demonstrated that Beaner was able to understand the difficulty he faced. He further opined that as of October 16-17, 2002, Beaner probably knew that he had the option of talking to police or refusing to talk to them and that he had a right to a lawyer, but he may not have realized how much jeopardy he was in without a lawyer. Dr. Robinson also testified that he was "pretty sure *675 [Beaner] recognized that talking to the police about things he did would probably wind up influencing their behavior towards him." Beaner was oriented as to time, place and circumstance at the time of Dr. Robinson's sanity commission interview with Beaner. The defendant also was able to reiterate the range of possible verdicts that he faced if convicted, and he gave a detailed account of the events that led to his arrest. However, Dr. Robinson was unable to determine how much of this information Beaner had learned while he was in prison subsequent to his arrest.
Dr. Robinson testified that it is possible that Beaner did not really appreciate what he was doing when he agreed to give his second statement. However, he opined that it is also just as possible that Beaner knew the significance of a Miranda warning given his cultural exposure and the fact that such warnings are repeatedly shown on TV. Detective Brown testified at the second suppression hearing and reiterated that Beaner's responses to their questions were appropriate and that they had no reason to believe that Beaner was unable to knowingly and intelligently waive his Miranda rights.
Mrs. Faye Willliams, a cafeteria worker at Captain Shreve High School in Shreveport when Beaner attended the school, testified on behalf of Beaner at the second suppression hearing and at trial. According to Mrs. Williams, Beaner worked in the cafeteria as part of a special education training program at the school. During her almost daily interaction with Beaner over a period of three years, Williams observed that Beaner never seemed to grasp even easy tasks such as washing the dishes and sweeping the floor. She believed that Beaner could not grasp multiple concepts at once.
On September 26, 2005, Judge Crichton ruled that the Beaner was both competent to stand trial and that his inculpatory statements were properly admissible into evidence. He denied the motion to suppress. Judge Crichton found that even though Beaner was mildly mentally retarded, Beaner had the mental capacity to understand the Miranda rights and to knowingly and intelligently waive them. Judge Crichton found significant the fact that Beaner demonstrated a basic understanding of the right to remain silent, that he did not have to talk to police unless he wanted to, and the of concept that any evidence he gave police could be used against him. Beaner was able to explain these concepts in his own words. Judge Crichton also placed considerable weight on the results of the CAST MR examination.
The court noted that while Beaner's academic performance was unquestionably poor, that did not reflect his true functional ability. Beaner was provided Miranda warning's on two occasions with a sufficient intervening period of time between the warnings within which Beaner was able to decide whether to make further statements to police. Under the totality of the circumstances, Judge Crichton found that Beaner had enough street smarts and functional capacity to understand his constitutional rights and that Beaner voluntarily, knowingly, and intelligently waived them.
In determining whether a ruling on a motion to suppress is correct, an appellate court is not limited to evidence adduced at the hearing on the motion but also may consider pertinent evidence given at trial. State v. Daniels, 614 So.2d 97 (La.App. 2d Cir.1993), writ denied, 619 So.2d 573 (La.1993).
Before the State can introduce any inculpatory statement made in police custody, it bears the heavy burden of establishing *676 that Beaner received a Miranda warning and that the statement was freely and voluntarily made, and not the product of fear, duress, intimidation, menaces, threats, inducements or promises. La. C. Cr. P. art. 703; La. R.S. 15:451; State v. Johnson, 36,014 (La.App.2d Cir.6/12/02), 821 So.2d 652. As a matter of federal constitutional law, any confession obtained by any direct or implied promises, however slight, or by the exertion of any improper influence, must be considered involuntary and inadmissible. State v. Roddy, 33,112 (La.App.2d Cir.4/7/00), 756 So.2d 1272, writ denied, XXXX-XXXX (La.5/11/01), 791 So.2d 1288. At a suppression hearing, the State bears the burden of proving beyond a reasonable doubt the free and voluntary nature of the confession. State v. Hills, 354 So.2d 186 (La.1977); State v. Roddy, supra.
The admissibility of a confession is a question for the trial court. A trial court's findings following a free and voluntary hearing are entitled to great weight and will not be overturned on appeal unless not supported by the evidence. State v. Durr, 28,197 (La.App.2d Cir.6/26/96), 677 So.2d 596; State v. English, 582 So.2d 1358 (La.App. 2d Cir.1991), writ denied, 584 So.2d 1172 (La.1991). We place great weight upon the trial court's factual determinations because of its opportunity to observe witnesses and assess credibility. State v. Crews, 28,153 (La.App.2d Cir.5/8/96), 674 So.2d 1082. Testimony of the interviewing police officers alone may be sufficient to prove that the statement was given freely and voluntarily. State v. Bowers, 39,970 (La.App.2d Cir. 8/19/05), 909 So.2d 1038; State v. Henderson, 31,986 (La.App.2d Cir.8/18/99), 740 So.2d 240.
Low intellect, moderate retardation or diminished mental capacity does not per se and invariably vitiate capacity to make a free and voluntary statement or a knowing and intelligent Miranda waiver. State v. Manning, XXXX-XXXX (La.10/19/04), 885 So.2d 1044, cert. denied, Manning v. Louisiana, 544 U.S. 967, 125 S.Ct. 1745, 161 L.Ed.2d 612 (2005); State v. Green, XXXX-XXXX (La.5/22/95), 655 So.2d 272. Any mental incapacity is an important factor to consider in deciding the voluntariness of a confession. State v. King, 41,084 (La.App.2d Cir.6/30/06), 935 So.2d 815, writ denied, XXXX-XXXX (La.2/16/07), 949 So.2d 411. Voluntariness is determined on a case-by-case basis, under a totality of the circumstances standard. Manning, supra; State v. King, supra.
Here, there is no question that the defendant was informed of his Miranda rights at least twice during a two-hour period prior to his confession. There is also no evidence which suggests that the police coerced, forced or otherwise mistreated Beaner into making a confession. The central issue is whether the defendant sufficiently understood his Miranda rights to make a knowing, intelligent waiver of such rights. The record demonstrates that the state met its burden of proof.
At all times, Beaner stated that he understood his rights, and he never appeared to be unable to do so. Beaner's first statement to police represented an attempt to extricate himself from culpability for the double murders, and the evolution over time, in response to the detectives' suggestion that they had new information about the crime from Jemarcus Monroe, reveals a mental agility and adaptability which cannot be readily associated with any finding that he lacked understanding of his constitutional rights. Beaner had a two-hour period to contemplate whether to provide any additional information to police.
Furthermore, the progress of the interrogation supports the view of Beaner's understanding *677 of the interrogation process and his willingness to speak with police. Beaner gave appropriate "yes" and "no" responses to a series of questions that called for varied responses. Beaner provided a detailed chronological account of the events that led to his arrest. In fact, he was able to recall the exact make and model of gun that he used. Beaner also knew the familial relationships between and among the individuals involved, and even corrected the officers during the interrogation. Moreover, Beaner did not appear to have any difficulty understanding the detectives' questions. During the sanity commission interview with. Goebel in the months following his arrest, he demonstrated at least a basic understanding of what the Miranda rights encompass and at least a minimal understanding of what their waiver entails.
The Louisiana Supreme Court and this court have found persons with similar diminished mental capabilities as Beaner able to understand and knowingly waive their Miranda rights. In State v. Green, supra, the defendant filed a motion to suppress on the basis of a psychologist's testimony that he suffered organic brain syndrome. The defendant had an IQ of 65 with a "mental age" of a 10-year-old, and was deemed "mildly retarded." Like the instant case, the defendant in Green initially gave police a false story to extricate himself from culpability for the murder. Like the instant case, the defendant in Green also gave a detailed account of the facts. The defendant was also familiar with the criminal justice process. Despite the defendant's diminished mental capacity, the supreme court found that the totality of the circumstances showed that the defendant sufficiently understood his Miranda rights so as to make a knowing waiver.
In State v. King, supra, the defendant was deemed "mildly retarded" with an IQ score in the upper 60's to 70 range. Indeed, the defendant was initially found to be unable to stand trial at a sanity hearing. This court ruled that notwithstanding the defendant's diminished mental capacity, the evidence demonstrated that he understood his constitutional rights and knowingly and intelligently waived them, pointing to the fact that the defendant was able to respond to the questions during the interrogation in detail and appropriately.
The defendant in State v. Brooks, XXXX-XXXX (La.1/17/95), 648 So.2d 366, was illiterate and scored a 67, a 44, and a 61 on three separate IQ tests. He was diagnosed as "moderately retarded" based on the low IQ score of 44, with a mental age between 10 and 12 years old. The supreme court's initial doubt concerning whether the state met its burden of proof was dispelled by the testimony showing that the defendant had feigned episodes of emotional disturbance in an attempt to show that he was crazy. The court also found significant the defendant's apparent frankness and coherence during the course of his confession and the extent to which he was able to provide specific details about the crime. The totality of the evidence required that the motion to suppress be denied, and the court affirmed the defendant's conviction for first degree murder.
In State v. Brown, 414 So.2d 689 (La. 1982), the supreme court ruled that the trial court did not abuse its discretion in concluding that defendant's statement was knowingly and voluntarily made, even though the testimony at the sanity hearing and at trial placed his IQ between 65 and 75. The totality of the circumstances showed that the defendant was capable of distinguishing between right and wrong and of intelligently assisting in his defense. *678 Both investigating officers testified that the defendant was repeatedly advised of his rights and that he indicated that he understood those rights.
In State v. Lindsey, 404 So.2d 466 (La. 1981), the evidence showed that the defendant was illiterate, his thinking was "extremely simple" and concrete, and his IQ was between 50-60. The defendant was classified as "mildly to moderately retarded." The defendant told police that he had only a third grade education, and the defendant's parents testified that he was a slow learner. Nonetheless, the supreme court found that the record supported the trial court's ruling that the confession was voluntary because the defendant stated he understood his rights at the interrogation, and he never appeared to be unable to do so.
The view that Beaner in the instant case was able to understand his rights is bolstered by the fact that the extrinsic facts corroborated Beaner's ultimate confession. While the accuracy of his confession is not the focus of this inquiry, when faced with a claim that the defendant's mental processes are so dysfunctional as to preclude a full understanding of those rights, any facts which shed light upon the functioning of the defendant's mental processes are relevant and pertinent. See, State v. Green, supra. The trial court's findings were more than adequately supported by reliable evidence in this case.
This assignment is without merit.
Motion for New Trial
The defendant further argues that he should have been granted a new trial based on newly discovered evidence indicating that Dr. George McCormick, the Caddo Parish Coroner at the time the victims' autopsies were performed, did not actually perform the autopsies at issue, that he did not actually remove the bullet from Chiquita Chambers' body, and that he did not initial the vial which contained the evidence, thus causing a break in the chain of custody sufficient to warrant a new trial. He also argues that the state withheld favorable evidence concerning the irregularities in the, procedures of Dr. McCormick's office and of the District Attorney's ongoing investigation into such practices and procedures.
The state argues that even if Dr. McCormick was absent at the time of removal of the bullets, this absence did not compromise the integrity of the chain of custody of these bullets. The state also contends that there was abundant evidence supporting Beaner's guilt regardless of whether the bullet removed from Chiquita Chambers' body came from Beaner's gun. The state denies that it withheld favorable evidence in violation of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed2d 215 (1963).
Caddo Parish Coroner Dr. George M. McCormick, II, died on September 20, 2005, less than a week before the trial commenced in this case. Dr. McCormick's name and signature appears on the Certificates of Death and the autopsy reports/procés verbal for both victims, Chiquita Chambers and Jermichael Lewis.
At trial, the state presented the Certificates of Death and the autopsy reports/procés verbal for Chiquita Chambers and Jermichael Lewis showing that their October 14, 2002 deaths were due to gunshot wounds. The state and defense stipulated to these exhibits at the beginning of trial. The state also presented Caddo Deputy Coroner Greg Clement, who testified that he directed that Chambers' and Lewis' bodies be transported to the Coroner's Office for autopsies, that it is the procedure of the coroner's office that each body is assigned a unique autopsy number and that the number is on any report and *679 any evidence in connection with each body. Clement testified that Dr. McCormick would have been the person who performed the autopsies at issue in this case, because Dr. McCormick was always present during autopsies and would initial evidence. Clement testified as to the procedures for chain of custody with respect to the handling of evidence taken from bodies. With respect to this case, he testified that he received two vials each with the separate autopsy numbers of Lewis and Chambers, respectively, described as "bullets removed from decedent." The vials were initialed "GM." Clement transferred the vials to the Northwest Louisiana Criminalistics Laboratory for ballistics analysis. The ballistics analysis revealed that the bullet removed from Chambers' body was from Beaner's gun.
On Monday, October 3, 2005, during the middle of the trial, the state informed defense counsel and the court that the District Attorney had received a phone call from Lisa Hayes' attorney. Ms. Hayes, the former lab director of Forensic Pathologists, Inc., assisted Dr. McCormick's office during the relevant period. The defendant suggests that Dr. McCormick had not performed all the autopsies attributed to him and that in fact, Hayes had performed autopsies. The state advised that it learned of Ms. Hayes' phone call on Friday, September 30, 2005. Defense counsel objected to the admission of the autopsy reports, proces verbal and the death certificates based on this new information. The trial court nonetheless admitted the death certificates, the autopsy reports and the proces verbal pursuant to La. C. Cr. P. art. 105 and La. C.E. art. 803(9).
However, the trial court issued an instanter subpoena to Lisa Hayes, and pursuant to the subpoena, Ms. Hayes and her attorney appeared. The trial court took a recess to allow defense counsel the opportunity to interview Ms. Hayes and to make a determination whether to present Hayes' testimony to the jury. After defense counsel's discussions with Ms. Hayes, the defense advised the court that Hayes would not be presented.
The defendant was convicted of second degree murder on October 4, 2005, and was sentenced on October 17, 2005. Thereafter, the state informed defense counsel of additional possible Brady evidence. Apparently, while the trial was ongoing, the Caddo Parish District Attorney's Office launched an investigation initially focused on Lisa Hayes' alleged actions, but the scope of the investigation was later broadened to include the practices and procedures of Dr. McCormick, the Caddo Parish Coroner's Office, and Forensic Pathologists, Inc. According to the state, the investigation revealed additional evidence suggesting that Dr. McCormick may not have performed the autopsies at issue. On December 27, 2005, the defendant filed a motion for new trial based on this newly discovered evidence.
The trial court held an evidentiary hearing on the motion for new trial that lasted four days. Lisa Hayes, an expert in the field of forensic pathologist assistant, testified that during the period 2000-2005, she assisted Dr. McCormick with all of his autopsies for Caddo Parish. At times, she Marked evidence with Dr. McCormick's initials. She testified that over a period of 15 years, Dr. McCormick trained her to dissect bodies at autopsies, remove the organs, and remove bullets to preserve for evidence. She detailed the procedures they followed in October 2002 to remove and preserve bullets as evidence. Hayes did not, however, have any independent recollection of Chambers' or Lewis' autopsies. The record indicates that the *680 additional files related to the autopsies could not be located. According to Hayes, the signature on Chambers' autopsy report was Dr. McCormick's signature.
Dr. James Traylor, an expert in anatomic pathology and forensic pathology, testified about the standard practice concerning criminal homicide autopsies and the preservation of evidence. While he conceded that Dr. McCormick's absence at the time of Chambers' autopsy would have been substandard, based on his review of the record, any such absence in this case did not compromise the integrity of Chambers' autopsy results or the chain of custody of the bullets removed from Chambers' body.
As long as [the bullet is] collected and appropriately labeled as a piece of evidence, until it goes from that location, kept there in a secure location, and then later transferred to whatever location, the crime lab, and someone signs off on it, then the evidentiary chain of custody is maintained.
During the new trial hearing, the defense spent much time attacking the procedures used under Dr. McCormick's tenure. During the motion for new trial hearing, there was some testimony indicating that the evidence cabinet at the Caddo Parish Coroner's Office was unlocked on occasions and that sometimes the room containing the cabinet remained unlocked overnight. There was also testimony indicating bodies and/or evidence would be released without Dr. McCormick ever viewing them. Importantly, however, there was no evidence or testimony adduced at the new trial hearing indicating that any evidence from the cabinet was ever misplaced, mislabeled, lost, stolen, modified, or otherwise altered.
Greg Clement also testified at the new trial hearing. Contradicting his prior testimony at trial, Clement stated that Dr. McCormick was absent during the autopsies he witnessed. In fact, Clement stated that sometimes Dr. McCormick would never even view the projectiles removed from the corpses. He admitted, however, that he was not present at the Chambers or Lewis autopsies and thus did not have any knowledge of who performed those autopsies or who removed the bullet from Chambers' body.
On September 13, 2006, the trial court denied the motion for new trial. The trial judge provided excellent, detailed reasons for the denial in a 13-page judgment.
The denial of a motion for new trial is not subject to appellate review except for error of law. La. C. Cr. P. art. 858; State v. Horne, 28,327 (La.App.2d Cir.8/21/96), 679 So.2d 953, writ denied, 1996-2345 (La.2/21/97), 688 So.2d 521. The decision on a motion for new trial rests within the sound discretion of the trial judge. State v. Horne, supra. The appellate court will not disturb this ruling on appeal absent a clear showing of abuse. Id. Generally, a motion for new trial will be denied unless injustice has been done, no matter upon what allegations it is grounded. State v. Dowden, 41,939 (La. App.2d Cir.3/28/07), 954 So.2d 300; State v. Horne, supra.
Newly discovered evidence affecting only a witness's credibility ordinarily will not support a motion for new trial because evidence which is "merely cumulative or impeaching" is not, according to the often-repeated statement of the courts, an adequate basis for the grant of a new trial. State v. Cavalier, XXXX-XXXX and XXXX-XXXX (La.10/31/97), 701 So.2d 949. Nevertheless, the trial court possesses the discretion to grant a new trial when the witness's testimony is essentially uncorroborated and dispositive of the question of guilt or innocence and it *681 appears that had the impeaching evidence been introduced, it is likely that the jury would have reached a different result. Id.
In the instant case, it cannot be said that the trial court abused its discretion in denying Beaner's motion for new trial. Indeed, the record clearly demonstrates that no injustice has been done. The new evidence sought to be made the basis of a new trial would not alter the result at a second trial, even if admitted, because the record was otherwise so strong against Beaner as would make such particular new evidence unavailing. Among other evidence, Beaner admitted that he was in the car involved in the drive-by shooting, and that he was one of the persons who fired shots outside the vehicle. It is uncontested that the victims died as a result of gunshots. Furthermore, several witnesses testified that the defendant said he wanted to retaliate for the incident at Woodlawn High School prior to the shooting, that he admitted to actually firing shots, and that he was happy and laughing when he came back from the shooting.
As the trial judge aptly noted, the question of whether the actual bullet that killed Chiquita Chambers came from Beaner's gun is not dispositive of the question of Beaner's guilt. Indeed, the jury convicted Beaner of second degree murder of Jermichael Lewis even though there was absolutely no evidence suggesting that the shot that killed Lewis came from Beaner's gun. In fact, the evidence showed that the bullet that killed Lewis came from the gun of another occupant in the car. Nonetheless, the defendant was charged and convicted as a principal to Lewis' murder in addition to Chambers' murder.
A principal is any person "concerned in the commission of a crime, whether present or absent, and whether they directly commit the act constituting the offense, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime." La. R.S. 14:24. The jury was instructed on this law, and Beaner did not object to this instruction. Given that Beaner confessed that he knowingly participated in the execution of the crime and that he indiscriminately fired out of the vehicle, admission of the evidence sought to be made the basis of a new trial, it would do nothing to change the result. See, State v. Mitchell, 39,305 (La.App.2d Cir.2/17/05), 894 So.2d 1240, writ denied, XXXX-XXXX (La.6/3/05), 903 So.2d 457.
Without the ballistics evidence there are sufficient facts to prove Beaner's guilt. Even if the ballistics evidence was necessary to prove Beaner's guilt, the trial court's denial of the motion for new trial was adequately supported by reliable evidence. The primary focus of the new trial hearing centered on who performed Chambers' autopsy, who removed the bullet, and who placed the bullet into the vial and sealed it. The defense does not dispute that Greg Clement was the investigator responsible for transporting the body to the coroner's office. The defense does not dispute that Greg Clement was the person who took the sealed vial containing the bullet to the crime lab. According to the defense, the purported defect in the chain of custody is the time period between the arrival of Chamber's body at the coroner's office to the period when Clement took the vial containing the bullet to the crime lab. However, the who is not really what is important in this case. Whether it was Dr. McCormick, or more likely, Lisa Hayes, who performed the autopsy, removed the bullet, and sealed the evidence, the overwhelming evidence is that one of them acted according to the coroner office's established protocol in preserving the evidence. The state has proven beyond a preponderance of the evidence that *682 the bullet that was determined to have come from Beaner's gun was the same bullet removed from Chambers' body. There was absolutely no evidence adduced at the new trial hearing suggesting that the bullet was misplaced, mislabeled, or altered.
The law does not require that the evidence as to chain of custody eliminate all possibilities that the bullet analyzed by the crime lab was not the bullet connected with this case. State v. Lawrence, 40,278 and 40,796 (La.App.2d Cir.3/15/06), 925 So.2d 727; State v. Hansbro, 35,027 (La. App.2d Cir.9/26/01), 796 So.2d 185, writ denied, 2001-2970 (La.10/25/02), 827 So.2d 1177; see also, State v. Arita, 04-39 (La. App. 5th Cir.3/1/05), 900 So.2d 37 (holding that gap in chain of custody concerning the transportation of the latent print to the crime lab was insufficient to rebut finding that the print was connected to the case), writ denied, XXXX-XXXX (La.11/29/05), 916 So.2d 165. In denying the motion for new trial, the trial court found that the evidence adduced at the hearing did not warrant a second trial, because the testimony adduced at trial established "beyond a preponderance of the evidence" that the bullet implicating Beaner was the same bullet taken from Chambers' body and that this new evidence would not change the result.
Again, it is important to note that the ballistics evidence in this case is merely cumulative of other evidence establishing Beaner's guilt. The record does not demonstrate that the trial court's ruling was incorrect.
The trial court found that Clement's inconsistent testimony at the new trial hearing, while troubling, was actually collateral to his chain of custody testimony at trial and thus did not justify a second trial. His inconsistent testimony concerned who might have performed the autopsies at issue. As explained above, however, the issue of who removed the bullet does not rise to the level of a defect warranting a new trial. The other testimony concerning chain of custody, including the testimony of several witnesses regarding the Caddo Parish Coroner's Office custom and policy of preserving evidence, proved beyond a preponderance of the evidence that the bullet analyzed by the crime lab was the same bullet removed from Chambers' body.
More importantly, as explained above, Beaner's guilt is not even dependent on whether he fired the fatal shot at Chambers. For this reason, the trial court's ruling was correct with respect to this impeaching evidence.
The defendant contends that the state withheld evidence favorable to him, because it did not disclose the information provided by Nancy Hartwell and Kathryn Yurek prior to the conclusion of trial. On September 30, 2005, Hartwell and Yurek both gave statements to the Caddo Parish District Attorney's Office that were similar to Lisa Hayes' statement. While the state did timely inform the defense of Hayes' statement, it did not inform the defense of Hartwell's or Yurek's statement until weeks after the verdicts.
This allegation is meritless. First, neither Yurek nor Hartwell was employed at the coroner's office during the relevant time period. They did not begin working for Dr. McCormick until 2004, some two years after Chambers' and Lewis' autopsies. The materiality of this evidence is minimal at best. Second, the information provided by Yurek and Hartwell was cumulative of the information provided by Hayes. The defendant was given the essential facts permitting him to take advantage of any exculpatory information. See, State v. Kenner, XXXX-XXXX (La.12/16/05), 917 So.2d 1081. The defense thereafter *683 spoke to Hayes but chose not to call her on the stand for whatever reason.
Moreover, once the state obtained the written transcripts of the Yurek and Hartwell interviews in late October 2005, the state advised the defense of the same. Based on the record, the disclosure of Hartwell's and Yurek's statements would not have put the whole case in such a different light as to undermine the confidence in the verdicts. See, Youngblood v. West Virginia, 547 U.S. 867, 126 S.Ct. 2188, 165 L.Ed.2d 269 (2006). The chain of custody/ballistics evidence concerning the bullet taken from Chambers' body was not dispositive of Beaner's guilt. There is no reversible error.
This assignment is therefore without merit.
Right to Confrontation
The defendant argues that the trial court erred in admitting the death certificates, the autopsy reports, and the procés verbal, because these documents were not proven to be trustworthy and because the admission of these records without prior opportunity to cross-examine their maker violated his right to confrontation under the Sixth Amendment. Beaner also argues that the bullets allegedly taken from the bodies of Chambers and Lewis were erroneously admitted because they were not properly identified by chain of custody.
The state argues that the challenged evidence was properly admitted. The state further contends that neither Dr. McCormick's absence at the time of removal of the bullets nor his death prior to the trial compromised the integrity of the chain of custody of these bullets in any way.
La. C. Cr. P. art. 105, provides:
In a case involving the apparent commission of a crime, the coroner shall make a written report of his investigation to the district attorney within ten days after the completion thereof. In homicide cases the coroner's report shall certify the cause of death.
The report shall be in addition to the procés verbal of an autopsy required by R.S. 33:1565. [Footnote omitted.]
A coroner's report and a procés verbal of an autopsy shall be competent evidence of death and the cause thereof, but not of any other fact.
The Sixth Amendment of the United States Constitution and Article I, § 16, of the Louisiana Constitution guarantee an accused in a criminal prosecution the right to be confronted with the witnesses against him. The primary purpose behind this right is to secure for the defendant the opportunity for cross-examination. State v. Garner, 39,731 (La.App.2d Cir.9/8/05), 913 So.2d 874, 884, writ denied, 2005-2567 (La.5/26/06), 930 So.2d 19; State v. Hotoph, 99-243 (La.App. 5th Cir.11/10/99), 750 So.2d 1036, writs denied, XXXX-XXXX & XXXX-XXXX (La.6/30/00), 765 So.2d 1062, 1066. Cross-examination is the principal means by which the believability of a witness and the truth of his testimony are tested. Id.; State v. Hillard, 398 So.2d 1057 (La.1981).
In Crawford v. Washington, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), the United States Supreme Court held that the Sixth Amendment's Confrontation Clause bars testimonial hearsay unless the witness is unavailable and the defendant had a prior opportunity to cross-examine the witness. The U.S. Supreme Court expressly stated, however, that "not all hearsay implicates the Sixth Amendment's core concerns." Crawford v. Washington, 541 U.S. at 51, 124 S.Ct. at 1364. The Confrontation Clause applies to "witnesses" against the accused. The Court noted that its analysis of "testimony" excludes at *684 least some hearsay exceptions, such as business records. Id., 541 U.S. at 56, 124 S.Ct. at 1367 ("[m]ost of the hearsay exceptions covered statements that by their nature were not testimonial-for example, business records or statements in furtherance of a conspiracy.").
By its express terms, La. C. Cr. P. art. 105 does not authorize admission of coroner's reports to prove any facts other than death and cause of death. See, State v. Monroe, 345 So.2d 1185, 1187 (La. 1977). The proof of the death or cause of death by a coroner's report is not proof of guilt or innocence. Generally, such evidence does not implicate the accused. It is rem ipsam evidence. State v. Holmes, 258 La. 221, 245 So.2d 707 (La.1971), cert. denied, Holmes v. Louisiana, 406 U.S. 909, 92 S.Ct. 1612, 31 L.Ed.2d 820 (1972). In State v. Anderson, 41,489 (La.App.2d Cir.11/1/06), 942 So.2d 625, this court agreed with the rationale set forth in State v. Leonard, XXXX-XXXX (La.App. 1st Cir.4/27/05), 915 So.2d 829, reversed on other grounds, XXXX-XXXX (La.6/16/06), 932 So.2d 660, finding that the narrowly drawn La. C. Cr. P. art. 105 rendered the coroner's report as nontestimonial hearsay and thus admissible under Crawford, because it was admissible only for the purpose of proving death and cause of death.
Courts in other states have found that coroner's reports are generally nontestimonial under Crawford. See, U.S. v. Feliz, 467 F.3d 227 (2nd Cir.2006), cert. denied, Erbo v. U.S., ___ U.S. ___, 127 S.Ct. 1323, 167 L.Ed.2d 132 (2007); People v. Durio, 7 Misc.3d 729, 794 N.Y.S.2d 863 (N.Y.Sup. 2005); Moreno Denoso v. State, 156 S.W.3d 166 (Tex.App.2005); Perkins v. State, 897 So.2d 457 (Ala.Crim.App.2004).
La. C.E. 803 provides, in pertinent part:
The following are not excluded by the hearsay rule, even though the declarant is available as a witness:
(9) Records of Vital Statistics. Records or data compilations, in any form, of birth, filiation, adoption, or death, including fetal death, still birth, and abortion, or of marital status, including divorce and annulment, if the report thereof was made to a public office pursuant to requirements of law, and any record included within the Louisiana Vital Statistics Laws.
Although the defendant contends that the trial court erred in admitting the death certificates, autopsy reports, procés verbal, and the bullet taken from Chamber's body, the crux of his argument with respect to this assignment centers on the state's alleged failure to establish the chain of custody of the bullet between the arrival of Chamber's body at the coroner's office to the period when Clement took the vial containing the bullet to the crime lab.
The death certificates admitted at trial contain general descriptions of the cause of the death. There is nothing in the certificates that is testimonial in nature or that implicates Beaner. The death certificates were properly admitted under La. C.E. 803(9) and are prima facie evidence of the facts contained therein. State v. Anderson, supra. It should be noted that defense counsel conceded at trial the deaths and causes of death for both Chambers and Lewis.
Beaner contends that the trial court. erred in admitting the bullet purportedly taken from Chambers' body and the ballistics information that showed that the bullet came from Beaner's gun because of a defect in the chain of custody, i.e., the lack of testimony concerning who performed the autopsy, who removed the bullet, and who placed the bullet in the vial to preserve as evidence.
To admit demonstrative evidence at trial, the law requires that the *685 object be identified. State v. Lawrence, supra. Identification can be visual or by chain of custody of the object. Id. The identification need not be absolute, certain or wholly unqualified. Id. Where there is some evidence for identification purposes, the objection to the sufficiency goes to the weight rather than admissibility. Id.
As explained with respect to assignment of error number two, the state proved beyond a preponderance of the evidence that the bullet found to have come from Beaner's gun was the same bullet taken from Chambers' body even considering the gap in the chain of custody. Thus, the trial court did not err in admitting the evidence.
A coroner is required to make a written report of his investigation to the district attorney in any case involving a homicide pursuant to La. C. Cr. P. art. 105. Pursuant to article 105, such a report is excepted from the hearsay rule and may be admitted in evidence as proof of death and the cause thereof. State v. Trahan, 576 So.2d 1, 9 (La.1990); State v. Monroe, supra; State v. Garner, supra; State v. Rhodes, 29,207 (La.App.2d Cir.01/22/97), 688 So.2d 628, 639 citing State v. Kelly, 375 So.2d 1344 (La.1979), writ denied, XXXX-XXXX (La.9/26/97), 701 So.2d 980.
The defendant's confrontation concerns about the purported unreliability of the evidence are misplaced. The Supreme Court's decision in Crawford required courts to re-evaluate the circumstances under which admitting a hearsay statement at a criminal trial comports with the Confrontation Clause of the Sixth Amendment. Prior to Crawford, under Ohio v. Roberts, 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980), statements of an unavailable declarant were constitutionally admissible at trial only if they bore adequate "indicia of reliability." In Crawford, the Supreme Court set aside the "indicia of reliability" standard and instead drew a distinction between testimonial and nontestimonial hearsay. Under this new standard, testimonial hearsay is constitutionally admissible in a criminal trial only if the defendant had a prior opportunity to cross-examine the unavailable declarant. Crawford's per se bar applies regardless of whether the testimonial statement falls within a firmly rooted hearsay exception or has particularized guarantees of trustworthiness. Although Crawford left open the question of whether the admissibility of nontestimonial statements were still to be evaluated under the pre-Crawford analysis, the Supreme Court has since made clear that the right to confrontation has no application to nontestimonial statements. Davis v. Washington, 547 U.S. 813, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006). Thus, in this case, the real issue is whether the evidence is testimonial in nature.
As explained above, this court is one of the few courts that has addressed the admissibility of autopsy reports postCrawford. In State v. Anderson, the court held that the entire report was nontestimonial. Like the autopsy report in Anderson, the record in the instant matter reveals that, aside from a single sentence (as= discussed more fully below), the information contained in the challenged autopsy report/procés verbal was routine, descriptive, nonanalytical, and thus, nontestimonial in nature. According to Chambers' autopsy report, Chambers' cause of death was "gunshot wound of the chest" The narrative of findings recounted that the "subject's death was due to a gunshot wound of the chest, resulting in laceration of the right brachiocephalic artery. Acute cardiorespiratory failure followed, due to blood loss." The report then details the gunshot wound in the victim's chest and neck. The report describes the location of *686 the wound, the injuries inflicted by the wound, whether the path of the bullet could be determined, and whether a projectile was recovered. Such information does not trigger the Crawford mandate for cross-examination pursuant to the Confrontation Clause. State v. Anderson, supra.
When the coroner's report is admitted without the testimony of the maker as to the authenticity of the report and when the report is cumulative evidence as to death and cause of death, there is no substantial violation of the defendant's statutory or constitutional rights. State v. Vincent, 338 So.2d 1376 (La.1976):
Neither the coroner's testimony nor the certification of the coroner's report was required to prove the victim's death. That fact could be established by any competent evidence, and proof of death was made otherwise at this trial. Introduction of the coroner's report and the copy of the procés verbal of the autopsy was merely cumulative and added little to the proof of death. The defense objection is rendered even less valid by the fact that the trial judge permitted the jury to hear only those portions of the report which pertained to death, the cause of death and the time of death. La.Code Crim. Pro. art. 105; State v. Holmes, 258 La. 221, 245 So.2d 107 (1971).
* * *
Any error which occurred by the State's failure to verify the report and the proces verbal by certification, or by the testimony of the Coroner, was not a substantial violation of a statutory or constitutional right. La.Code Crim. Pro. art. 921.
State v. Vincent, supra, at 1385.
Even if the six pages were left in the state's evidence binders and furnished to the jury, the only arguable relevant testimonial information found in those pages is the single sentence in the section discussing the "Missile Path." The coroner's description indicates that the bullet was "placed into a container labeled with the autopsy number, the date, and the word Bullet." The reason this is arguably testimonial is due to the alleged defect in the chain of custody during the period that the autopsy was being performed. The coroner's files relating to the autopsy are missing, Hayes did not recall performing the Chambers' autopsy, and Dr. McCormick died a week before trial. In other words, it is possible that someone other than Hayes prepared the report and thus the defendant did not have a prior opportunity to cross-examine the preparer. Moreover, this report is the only direct evidence concerning the handling of the bullet once it was removed from Chambers' body. The ballistics evidence tying the bullet to Beaner's gun certainly implicates Beaner, and thus, the chain of custody would be significant if this evidence were dispositive of Beaner's guilt. In determining whether a statement is testimonial, the court must keep in mind that the principal evil at which the Confrontation Clause was directed was the civil law mode of criminal procedure and particularly its use of ex parte examinations as evidence against the accused. Crawford v. Washington, supra.
Although the trial court properly ordered that these pages be excluded, it is unclear why the record still contains these pages. Even assuming that the pages were included and admitted into evidence, such purported error was harmless. Harmless error analysis begins with the premise that the evidence is otherwise sufficient to sustain the conviction if viewed from the perspective of a rational factfinder and asks whether beyond a reasonable doubt the error could not have contributed *687 to the verdict actually returned by the defendant's jury. State v. Haddad, XXXX-XXXX (La.2/29/00), 767 So.2d 682, cert. denied, 531 U.S. 1070, 121 S.Ct. 757, 148 L.Ed.2d 660 (2001). The inquiry, in other words, is not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in this trial was surely unattributable to the error. Sullivan v. Louisiana, 508 U.S. 275, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993).
First, even if the pages were excluded, the evidence demonstrated that it was more probable than not that the bullet was connected to this case. There was much testimony from numerous witnesses concerning the Caddo Parish Coroner's Office's custom and practice of removing and preserving bullets from victims in homicide cases. Second, and perhaps more importantly, the bullet evidence was not diapositive of Beaner's guilt. His guilt was established beyond a reasonable doubt based on his confession and his admissions to others that he was a knowing participant and shooter in the drive-by shooting.
This assignment is without merit,
Excessive Sentences
The defendant argues that the trial court erred by not imposing a lesser sentence based on his diminished mental capacity and his limited ability to understand the consequences of his actions. The state disagrees, arguing that the sentence was not excessive.
Beaner was convicted on two counts of second degree murder. The mandatory sentence for second degree murder is punishment by life imprisonment at hard labor without benefit of parole, probation or suspension of sentence. La. R.S. 14:30.1(B). The argument that the mandatory life sentence for second degree murder is a violation of the prohibition against excessive punishment in the Louisiana Constitution has been repeatedly rejected. State v. Parker, 416 So.2d 545 (La.1982); State v. Brooks, 350 So.2d 1174 (La.1977); State v. Roberson, 40,809 (La.App.2d Cir.4/19/06), 929 So.2d 789.
In State v. Dorthey, 623 So.2d 1276 (La. 1993), and State v. Johnson, XXXX-XXXX (La.3/4/98), 709 So.2d 672, the supreme court addressed the issue of mandatory sentences in the context of the habitual offender law. The court held that the downward departure from a mandatory minimum sentence may occur in rare circumstances if the defendant rebuts the presumption of constitutionality by showing clear and convincing evidence that he is exceptional, namely, that he is a victim of the legislature's failure to assign sentences that are meaningfully tailored to the gravity of the offense, the culpability of the offender, and the circumstances of the case. This rule has been extended to mandatory sentences beyond habitual offender cases. See State v. Fobbs, XXXX-XXXX (La.9/24/99), 744 So.2d 1274; State v. Chandler, 41,063 (La.App.2d Cir.9/8/06), 939 So.2d 574, writ denied, 2006-2554 (La.5/11/07), 955 So.2d 1277. However, the "rare circumstances" described by Johnson in which a mandated sentence can be altered are even less likely in the case of a life sentence chosen by the legislature for a single crime, such as aggravated rape or second degree murder. State v. Chandler, supra. In such crimes, unlike the mandatory minimum sentence under the habitual offender law, the "tailoring" of the sentence by the legislature was for life because the culpability of offenders and the gravity of the offense are so great. Id.
In this case, these mandatory sentences imposed are neither illegal, grossly disproportionate to the severity of the offense nor shocking to the sense of justice. During the pretrial stages, the trial court *688 found that defendant was not insane, that he had the capacity to proceed, and that he had the capacity to make a knowing and intelligent waiver of his Miranda rights. At the conclusion of trial, which included much testimony concerning Beaner's purported diminished mental capacity, the jury found that he had the specific intent to kill sufficient to convict him of two counts of second degree murder and thus rejected any lesser responsive verdicts. The evidence showed that Beaner fired a gun at a crowd during a drive-by shooting that resulted in the deaths of two bystanders. These offenses, which personify an appalling disregard for the sanctity of human life, justify the mandatory life sentences. The Louisiana Supreme Court and this court have upheld maximum or near maximum sentences imposed on persons with similar diminished mental capacities as Beaner. See, State v. Manning, supra; State v. Ware, 41,343 (La.App.2d Cir.9/27/06), 2006 WL 2742314 (not published); State v. Rankin, 41,128 (La. App.2d Cir.8/23/06), 938 So.2d 1172; State v. King, supra.
This assignment is therefore without merit.

ERROR PATENT
A review of the record reveals that the defendant was originally charged on December 12, 2002, by grand jury indictment with two counts of first degree murder for the deaths of Chambers and Lewis. He was later charged with second degree murder by an "Amended Indictment" signed by the district attorney on July 1, 2005, but it was not endorsed a true bill by the grand jury foreman. The defendant was tried for second degree murder and found guilty as charged.
La. C. Cr. P. art. 382(A) required that Beaner's prosecution for second degree murder be instituted by a grand jury indictment. However, district attorneys are empowered to amend indictments to charge lesser offenses. State v. Hansbro, supra. The state may abandon the charge of a greater crime and proceed with prosecution for the lesser. crime and no formal indictment is necessary for that purpose. Id. Thus, the district attorney had the power to amend the charge to second degree murder without a formal indictment. Id.
In any event, while the lack of a "true bill" endorsement is an error patent, the error is waived due to Beaner's failure to file a motion to quash before trial. La. C. Cr. P. arts. 533(5) and 535; State v. Thomas, 39,194 (La.App.2d Cir.1/26/05), 892 So.2d 161, writ denied, XXXX-XXXX (La.6/3/05), 903 So.2d 455; State v. Hansbro, supra.

CONCLUSION
For the foregoing reasons, we affirm the defendant's convictions and sentences.
AFFIRMED.
NOTES
[1] The record contains various spellings of Ms. Chambers' first name (e.g., Chaquita, Chiquita, Shaquita). For consistency purposes with the related cases in State v. Brooks, 42,226 (La.App.2d Cir.8/15/07), 962 So.2d 1220, and State v. Brown, 42,054 (La.App.2d Cir.8/29/07), 965 So.2d 580, we refer to Ms. Chambers as "Chiquita" for her first name.